## IN THE OREGON TAX COURT

## FREEDOM FEDERAL
## SAVINGS AND LOAN ASSOCIATION
*v.*
## DEPARTMENT OF REVENUE
(TC 2806)

James H. Conley, Salem, represented plaintiff.

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Opinion for defendant rendered November 7, 1989.

**CARL N. BYERS, Judge.**

Plaintiff appeals the value of its Corvallis headquarters building as of January 1, 1986, and January 1, 1987. The two-story building contains over 39,000 square feet, including basement, and is situated on 4.02 acres in a linear commercial zone. Constructed by Cascade Federal Savings and Loan Association (Cascade) in 1979 as a bank headquarters building, the property was sold in January 1984 to State Savings and Loan Association (State). State was closed by the Federal

Savings and Loan Insurance Corporation (FSLIC) in December 1985 and plaintiff took over the property.

A key issue in this case is the highest and best use of the property. Plaintiff's position is that realistic possible uses include: present use as a bank headquarters; use as a bank; retail use; mixed uses (retail and office); and office use. However, plaintiff sees the banking industry as weak and shrinking. In plaintiff's view, it is highly improbable that another concern could be found to use the property for banking. Therefore, plaintiff concludes that the highest and best use is as a multi-tenant office building. Plaintiff believes that the market for office space in Corvallis is mediocre and the subject property could offer "premier office space."

Defendant contends that the highest and best use of the property is as a bank headquarters building. Defendant's appraiser views it as a "special use" property because it was designed specifically for use by a bank to project an image of affluence and solidity.[1]

■    Plaintiff's view that the banking and savings and loan industry is weak may be correct. However, the fact remains that on the assessment dates in question, plaintiff used the building for banking purposes. Designed and built specifically for a bank, it has been occupied by a bank from its creation.

> "There are many instances in which highest and best use probably will change in the foreseeable future. * * *
>
> "The uses to which sites and improved properties are put until they are ready for their future highest and best uses are called interim uses. Interim uses are thus current highest and best uses that are anticipated to change * * *." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 261 (8th ed 1983).

■    Highest and best use looks to the use that, *at the time of appraisal,* is the most profitable likely use. *Tollefson v. Dept. of Rev.,* 8 OTR 1 (1979). The court finds that on January 1, 1986, and January 1, 1987, the highest and best use of the

---

[1] According to Friedman, *Encyclopedia of Real Estate Appraising* 765 (3rd ed 1978), "[a] special-use property is one that is designed, equipped, and used for a particular type of business or operation * * *." Due to the specialized nature of the improvements, conversion to some other use is costly.

subject property was its then current use, that of a bank head-quarters building.

Plaintiff's appraiser testified to two appraisal reports. The first report was done at the request of FSLIC to determine the market value and the liquidation value of the property. The second appraisal report was a summary of the first with a second addendum finding a "value-in-use." The second report is the primary vehicle for the appraiser's opinion.

Plaintiff's sales comparison approach evaluated sales of four office buildings, three occurring in 1983 and one in January 1985. The four sales ranged in size from less than 3,000 square feet to slightly more than 8,000 square feet. Only the smallest sale was of the same class or quality of construction as the subject. Due to the differences in size and quality, the court finds that none of these sales are comparable.

Plaintiff's income approach estimated annual income assuming the subject property was remodeled as a multi-tenant office building. Comparable leases and lease offerings were considered, indicating a range from $5.04 to $13.44 per square foot per year on a net basis. Even though plaintiff's appraiser sees the subject property as high quality, he estimated annual rent at $12 a square foot, less than the top asking rate reported. Assuming a two-year absorption term, the appraiser estimated the cost of conversion and rent loss to be $801,950. He testified that his conversion figure was based on contractors' estimates of the cost of converting for 15 to 20 tenants plus a deli or kitchen in the basement. Little evidence was offered to support his estimate of conversion costs. Plaintiff's conclusion of value by the income approach was $1,900,000.

Plaintiff's appraiser also used a cost approach based on the Marshall-Swift Cost Program, which gave an indicated cost of $4,188,709. Plaintiff deducted physical depreciation of ten percent and incurable functional obsolescence. He then added the value of the land of $700,000, arriving at a total value of $2,900,000 (rounded). He testified this approach was offered only as a check against the values indicated by the other approaches. After considering the values obtained by all the approaches, his final estimate of value was $1,900,000.

Defendant's appraiser believed that a valid market approach was not possible because there were no comparable sales. Sales of branch bank offices were so dissimilar in construction and design that using them in a market approach would be invalid. The appraiser contended that banking organizations do not buy buildings for use as a headquarters building; they build to their own specifications.

Defendant's appraiser also rejected an income approach, alleging there was insufficient data. He stated that home office banks were all owner-occupied; therefore, no rent data was available. He acknowledged there was information of rents for some branch offices, but branch offices are so inferior in quality to the subject property that adjustments would be unrealistic.

In his cost approach, defendant's appraiser also used the Marshall-Swift Cost Program. He, like plaintiff, classified the subject property as "Class B" construction. Defendant's reproduction cost new was $3,427,700. Defendant found no functional obsolescence, believing that the highest and best use was as a bank building. Allowing five percent for physical depreciation, defendant estimated total value (building plus site improvements) at $3,429,940. Defendant valued the subject land at $831,780. Defendant's total value for the subject property via the cost approach was $4,261,720.

With some reluctance, the court finds the cost approach must be given the greatest weight in this case. Although plaintiff's appraiser pried and scraped the market for sales and income information, virtually none of it was usable. As a consequence, the foundations for plaintiff's sales and income approaches resemble piles of rubble. This is not the fault of the appraiser. The subject property is unique to the area. Uses for the property other than as a bank headquarters are speculative. The court has determined that for the years in issue, the highest and best use of the property was as a bank headquarters building. This conclusion implies no incurable functional obsolescence as of the assessment dates. Hence, the parties' cost approaches, absent incurable functional obsolescence, result in similar indications of true cash value.

The statute directing that property be valued at its true cash value anticipates the lack of a market for some property. It specifies:

"If the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(1).

The indications of value by the cost approach here are consistent with the transaction whereby State Savings and Loan acquired the property from Far West Federal. In that transaction, the parties agreed that "[s]tate shall purchase such building and land at the appraised value of $4,260,000."

Considering all the evidence offered, the court finds the true cash value of the subject property on January 1, 1986, and January 1, 1987, was $4,261,720.

Costs to defendant.