Argued and submitted July 10, the judgment of the Tax Court affirmed
November 26, 1990

# FREEDOM FEDERAL SAVINGS
# AND LOAN ASSOCIATION,
*Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Respondent.*

## (OTC 2806; SC S36758)
801 P2d 809

James H. Conley, Salem, argued the cause and filed the briefs for appellant. With him on appellant's opening brief was Larry Jon Pound, Salem.

James C. Wallace, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

GRABER, J.

## GRABER, J.

Taxpayer is a savings and loan association. This *ad valorem* tax case concerns the true cash value of its headquarters in Corvallis. Taxpayer appeals from the Tax Court's judgment that $4,261,720 was the true cash value of the property for the 1986-87 and 1987-88 tax years. *Freedom Fed. Savings and Loan v. Dept. of Rev.,* 11 OTR 317 (1989). We review *de novo*, ORS 305.445; ORS 19.125, and affirm.

The property consists of 4.02 acres of land and a building containing about 39,000 square feet. Cascade Federal Savings and Loan Association constructed the building in 1979 for its headquarters. In 1983, Far West Federal Bank, with whom Cascade Federal had merged, sold the property to State Savings and Loan Association for $4,260,000. State Savings used the property for its headquarters. The Federal Savings and Loan Insurance Corporation (FSLIC) closed State Savings in December 1985, and taxpayer then acquired the property. Taxpayer used the property as its headquarters from December 1985 through the assessment dates, January 1, 1986, and January 1, 1987.

Taxpayer argues that the true cash value of the property on the assessment dates was $1,900,000, while the Department of Revenue (the Department) contends that the true cash value was $4,261,720. The disparity results from differing opinions about the highest and best use of the property, on which value is based.

■     The parties' expert witnesses provided several definitions of "highest and best use," all of which were similar. Taxpayer's appraiser, Howard, gave this definition:

> "[T]hat *reasonable and probable use that will support the highest present value as of the date of the appraisal;* alternatively, that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible which results in the highest land value. This definition is applied specifically to the highest and best use of land. It is recognized that in cases where a site has existing improvements, the highest and best use as if vacant may very well be determined to be different from that given the existing improvements (as improved). The existing use will continue, however, until the land value, in its highest and best use, exceeds that total value of the property under its

existing use plus the cost of removing or altering the existing structure." (Emphasis added.)

That definition is consistent with ORS 308.232, which requires property to be assessed at 100 percent of its true cash value, and with ORS 308.205, which defines true cash value as market value as of the assessment date. *Oregon Broadcasting Co. v. Dept. of Revenue,* 287 Or 267, 274-75, 598 P2d 689, *reh den* 287 Or 499, 601 P2d 473 (1979).

■ Although the parties agree generally on the definition of highest and best use, they disagree about how to apply the definition to the subject property. Taxpayer asserts that the highest and best use on the assessment dates was as a "first class, multi-tenant office building." In contrast, the Department contends that the highest and best use of the property was its then-existing use as a financial institution's headquarters. Taxpayer rejects a financial institution's headquarters as the highest and best use, arguing that the decline of the savings and loan industry made it highly improbable that another financial institution would have wanted to buy the property on the assessment dates.

■ We agree with the Department that, at the relevant times, the highest and best use of the property was as a financial institution's headquarters. The building was specifically designed and was used for that purpose. It contained extensive open space and expensive amenities, making it difficult to adapt for multi-tenant use. Although the savings and loan industry may have been weak, *on* the assessment dates taxpayer fully occupied the property as its headquarters. Whether the highest and best use would continue to be a financial institution's headquarters *after* the assessment dates is irrelevant.

■ Taxpayer argues that, if there were no immediate market for the property as a financial institution's headquarters, then the property had to be valued at an alternative use for which an immediate market existed. The question whether an immediate market exists for a building at a particular use is separate, however, from the question whether that use is highest and best. If taxpayer were correct, then ORS 308.205(1) would have little purpose. ORS 308.205(1) provides for the valuation of property that has no immediate market: "If the property has no immediate market value, its true cash value is

the amount of money that would justly compensate the owner for loss of the property." The *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use.

Moreover, Howard, taxpayer's own appraiser, contradicted the argument that a multi-tenant office building was the highest and best use of the subject property. He appraised the building for its "value-in-use" as a financial institution's headquarters, as well as for its value as a multi-tenant office building. Howard estimated the value as a financial institution's headquarters at $2.2 million[1] and the value as a multi-tenant office building at $1.9 million. By taxpayer's own analysis, therefore, the existing use, which surely was "reasonable and probable," resulted in "the highest present value as of the date of the appraisal."

Having determined the highest and best use, we now consider the value of the property at that use. The county must assess real property at 100 percent of its "true cash value." ORS 308.232. ORS 308.205 defines "true cash value" as the market value of the property as of the assessment date. Our inquiry is not determined by fixed principles of law, but is a factual determination based on the record. *Brooks Resources Corp. v. Dept. of Revenue,* 286 Or 499, 503-04, 595 P2d 1358 (1979). Taxpayer has the burden to show that its approach to valuation best reflects true cash value. ORS 305.427; *Lewis v. Dept. of Rev.,* 302 Or 289, 293, 728 P2d 1378 (1986).

Taxpayer's appraiser, Howard, performed two appraisals at the request of FSLIC. In the first, which Howard performed in late 1985 and early 1986, he found the market and liquidation values of the property. In that appraisal, he assumed that the highest and best use of the property was as a multi-tenant office building. In the second, which Howard performed in the fall of 1986, he valued the property at its "value-in-use" as a financial institution's headquarters. In both appraisals, he used sales comparisons.

■ In the first appraisal, Howard evaluated sales of four

---

[1] Howard based his analysis on data from bank *branch* buildings and not headquarters buildings. The Department's expert witness, Nelson, testified that headquarters buildings are generally higher in quality and more expensive.

office buildings in Corvallis. None of the buildings was a headquarters. Three of those sales occurred in 1983 and the fourth, in January 1985. Three of the buildings contained about 3,000 square feet, less than one-tenth the size of the subject building. The fourth building had slightly more than 8,000 square feet, also significantly smaller than the subject building. Three of the four buildings were of poorer quality than the subject building; the one building of comparable construction quality was the smallest of the four. We find that none of those sales was of comparable property.

■    In the second appraisal, Howard analyzed five sales that took place in Oregon from January 1983 through January 1986. The buildings ranged in size from 2,411 square feet to 18,961 square feet. Four of the five had less than 8,000 square feet. None of the buildings was in Corvallis, nor was any of them a headquarters. Howard himself testified that he could find no truly comparable sales, because the property was unique to the area:

> "Q   Would you agree with me that there is very little, if any, sales data or rental income information from buildings of the same quality of construction?
>
> "A   I would say there's none in Corvallis. I didn't see a building that was built as well as that.
>
> "* * * * *
>
> "Q   Did you attempt to obtain any sales information from buildings that had the same quality of construction in a community that was as near as possible to Corvallis?
>
> "A   I looked. * * * I * * * [w]asn't able to find anything."

We find that none of the sales reviewed in Howard's second appraisal was of comparable property.

The Department's appraiser, Erickson, thought that a market approach to valuation was impossible, because there were no comparable sales. His written appraisal noted that financial institutions do not usually buy their headquarters buildings, but instead build them to their own specifications. We find in accordance with that evidence.

■■    On this record, we are persuaded, as was the Tax Court, that the cost approach was the most appropriate

method to value the property.[2] Both parties' appraisers analyzed the value of the property using the cost approach. Both used the Marshall-Swift Cost Program to determine "reproduction cost new" and classified the property as "Class B" construction.[3] Both deducted physical depreciation, although at different rates.[4]

The primary difference between the parties' calculations results, again, from their different opinions about highest and best use. Erickson, the Department's appraiser, valued the property at $4,261,720, using the cost approach. The property had, in fact, sold for $4,260,000 in 1983. Howard, taxpayer's appraiser, valued the property at $2,876,891, using the cost approach. He first found that the total value (taking into account physical depreciation) was $4,469,838, *but* he then deducted $1,592,947 for "functional incurable obsolescence." According to Howard,

> "Functional Obsolescence is the adverse effect on value resulting from defects in design. * * * Incurable, functional obsolescence involves items of inutility which it would not be economical to correct because the value would not increase as much as the cost of the correction."

The "inutility" to which he referred was that the property was overbuilt for a multi-tenant office building, which he believed was the highest and best use. Erickson did not deduct for functional obsolescence, believing that the existing use was highest and best. We agree with Erickson on that point, because the property was not defective in design for use as a financial institution's headquarters on the assessment dates. Without the deduction for functional obsolescence, Howard's

---

[2] Taxpayer's appraiser also estimated value-in-use by using an income approach. He estimated annual income by analyzing comparable leases and "converting a single year's estimate of income into a value indication." We are not persuaded that his method was appropriate. This headquarters was owner-occupied, as are most, making it difficult to determine market rent, which is necessary for the income approach; the leases that Howard analyzed were not on comparable property; and he made significant "adjustments" in his calculations without convincing support for them.

[3] Taxpayer contends that "the cost approach should not be used in this case because the class of construction has not been determined." Taxpayer is wrong. The Department's appraiser did determine the construction class, and the reliability of his determination of construction class was amply supported by its similarity to actual construction costs, indexed for inflation, and taxpayer's own determination of construction class.

[4] Taxpayer does not argue that the Department's depreciation rate was wrong.

estimate of value under the cost approach was even higher than Erickson's.

Taxpayer has not met its burden to show that its appraisal methods best reflected true cash value. We hold that the value of the property on the assessment dates was $4,261,720.

The judgment of the Tax Court is affirmed.