## U.S. NATIONAL BANK OF OREGON,
*Plaintiff,*

*v.*

## MULTNOMAH COUNTY ASSESSOR,
*Defendant,*

*and*

## DEPARTMENT OF REVENUE,
*Intervenor-Defendant.*

(TC 4446)

Trial was held March 20, 21, and 22, 2001, in the courtroom of the Oregon Tax Court, Salem.

Christopher Robinson, Lake Oswego, argued the cause for Plaintiff (taxpayer).

John S. Thomas, Multnomah Assistant County Counsel, Portland, argued the cause for Defendant (the county).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, filed an Answer in Intervention for Intervenor-Defendant (the department), but did not argue the cause.

Decision rendered August 30, 2001.

**CARL N. BYERS, Senior Judge.**

Plaintiff (taxpayer) appeals the 1997-98 assessed value of a large facility used as a bank data/operations center, identified by the assessor as Account No. R-94330-0880.[1] Taxpayer claims that the real market value (RMV) of the property is significantly less than its assessed value due to technological and other changes. Defendant Multnomah County Assessor (the county) defended at trial. Intervenor-Defendant Department of Revenue intervened but did not appear at trial.

## FACTS

The subject property is a 365,000 square foot, two-story building on 43.02 acres located between Interstate 84 and Sandy Boulevard in Gresham.

In the late 1980s, taxpayer decided it needed a large data/operations center. It conducted an extensive study of the banking industry and that industry's use of technology. International Business Machines (IBM), a major manufacturer of mainframe computers, served as taxpayer's primary advisor with regard to the then current and future computing needs of the banking industry. IBM anticipated that mainframe computers would become larger, produce more heat, and continue to need to be located in close proximity to each other. Those projections and other insights resulted in taxpayer constructing a single building of extraordinary size with two-foot raised floors in the 47,000 square foot area intended for mainframe computers (including a 17,000 square foot expansion area). Oversized cabling, connectors, switches, and other electrical features were installed to handle the anticipated increased load. The design responded to anticipated increased heat by installing two 1,200-ton and one 500-ton cooling units (chillers) with a 96,000 gallon underground water tank.

In addition to those technological projections, taxpayer and its advisors saw the need for absolute reliability in

---

[1] Taxpayer withdrew its appeal of a separate but related tax account (Account No. R-66771-5430).

the total functioning of the data/operations center. Consequently, extraordinary measures were taken to design and construct the building to avoid any kind of downtime. For example, the building is constructed with extraordinary seismic resistance, enabling it to withstand an earthquake up to 8.5 on the Richter Scale, more than double the usual standard. Electrical forces and sources were also a major concern. The decision-makers therefore had a grounding mat installed under the entire building. An extensive uninterruptible power system (UPS) ensures a clean and steady source of power. Large batteries provide immediate backup, and the battery system was to be supported by a bank of nine generators fueled from underground fuel tanks. Taxpayer designed redundancy into almost every system in order to permit maintenance and repairs without any cessation of operations.

The facility is designed for a single user (as opposed to multiple tenants) with a large atrium at the entrance and down the center of the building. In addition to larger-than-usual shipping and loading docks, a warehouse, and semi-industrial area, there are large open areas for offices, an employee cafeteria, and (originally) an employee health club. The building is also amenable for use as a research and development site, light or high-tech manufacturing, financial operations, insurance headquarters, and similar uses.

Two major changes affected how the building is used. First, technology moved in the opposite direction of that anticipated by taxpayer's advisors. Before the framework of the building was completed, fiber-optic cable became standard for connections between computers, eliminating the need for close proximity. Processing chips became smaller, faster, and gave off less heat, and businesses began making extensive use of networked personal computers connected to smaller mainframe computers. As a consequence, some of what had been installed in taxpayer's building was either obsolete or excessive before the building was completed.

The second major change occurred in the banking industry itself. Following the lead of other national and international businesses, the banking industry experienced a waive of mergers and consolidations. In March 1997, the

First Bank of Minnesota announced that it would acquire and merge with taxpayer. From the beginning, before the merger was certain, merger participants planned to consolidate and move the main data-processing functions to an existing center in St. Paul, Minnesota. The subject's computer center, with its mainframe computer, would be deactivated. Therefore, as of the July 1, 1997, assessment date, taxpayer's facility was still operating as a data/operations center, but it was clear that it would not continue to do so.

## VALUATION EVIDENCE

Appraiser Robert Gill testified for taxpayer. Based on his analysis, Gill concluded that the highest and best use of the property was not as a data/operations center but for closely allied uses such as an operation center without a mainframe computer, light manufacturing, research and development, and similar uses. His analysis appears to have relied on the fact that taxpayer knew it would be closing the computer center and his belief that the computer center features were obsolete as of the assessment date. He believes that computer systems are so individualized that it would be "unreasonable to assume" that the computer center in the subject property would be used by anyone else.

Because of the changes in the banking industry, he saw no market for the property as a data/operations center. He testified that any buyer for a use other than as a data/operations center would require a discount from the owner. Gill also concluded that it is too expensive to convert such a large, open building to multiple-tenant use, making its best use as a single-tenant office or technical-service building. His anticipated uses did not include continuing to operate a computer center.

Gill used all three approaches to value. His cost approach was a replacement cost new (RCN), based upon the Marshall & Swift cost program. He hypothesized an office building with a cost rank of 2.0 average. That gave him a calculated RCN of $47,022,880 for the improvements only. After adjusting his RCN for physical depreciation and functional obsolescence, he arrived at an estimated RMV of $34,017,269. Gill deducted all of the computer center's mechanical and electrical costs on the theory that it was 100

percent obsolete and not useable. In addition, he deducted another $25 per square foot ($750,000) as the cost of converting the 30,000 square foot computer center area to office space.

In the sales comparison approach, Gill assumed that there was a national market. He found 11 comparable sales (seven of which took place after the assessment date) ranging in size from 147,260 square feet to 493,378 square feet.[2] The sales prices range from $70.65 to $108.45 per square foot with an average of $91.59 per square foot. Gill selected $90 per square foot, which, when multiplied by the subject's 365,000 square feet, indicates a market value of $32,850,000. None of the comparable sales was in Oregon.

In the income approach, Gill used three sets of comparables, the first of which were five leased-bank operations centers with mainframe computers. Those indicated a range of $.52 to $1.10 per square foot per month rent. Gill selected $.80 per square foot. He concluded that national sales comparisons supported $.80 per square foot. He also considered some single-tenant Oregon buildings, which suggested a rent of $.75 per square foot. After deducting for vacancy and credit losses, 3 percent for management, and 2 percent for reserves, and using a direct capitalization rate of 9.75 percent, Gill calculated an indicated value by the income approach of $32,400,000 (rounded).

In his reconciliation process, Gill averaged the three indicators of value to arrive at a value of $33,000,000 for the subject property as of July 1, 1997.

Carol Zurawski, an appraiser for the Multnomah County Assessor's Office, testified for the county. She testified that the highest and best use of the subject property was as a data/operations center, which was its actual use as of the assessment date in question. She also testified that the subject property was not designed with regard to marketability. She concluded that it is a special-use property for which there are no comparable sales or comparable income sources. Therefore, she relied entirely upon the cost approach.

---

[2] Most of those facilities were not single buildings but two or three associated buildings.

Zurawski also used the Marshall & Swift service to estimate a RCN. However, she concluded that Marshall & Swift's data did not include all of the special features found in the subject property. She therefore increased the cost 5 percent or $2,000,000 to reflect those special features. After deducting for depreciation, she concluded that the subject improvements had a value of $45,985,240 or approximately $125 per square foot. She compared that with the Ad-Tech center in Portland. That facility contains 250,000 square feet and was built in 2000 at a cost of $31,000,000. Zurawski indicated that it is of lower quality than the subject and her analysis of it supports her opinion of value for the subject property of $45,900,000 (rounded).

## ANALYSIS

The main point of dispute between the parties is the value of the special features. In calculating depreciated cost, Gill deducted $13,320,672[3] on the theory that the computer center is totally obsolete while Zurawski deducted zero on the theory that the computer center is totally useful.

Highest and best use is defined as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, *The Appraisal of Real Estate,* 297 (11th ed 1999). The concept of market value or RMV assumes that market forces will seek the maximum benefits from property. Based on the evidence presented in this case, the court finds that the highest and best use of the subject property as of the assessment date in question was as a bank data/operations center. That was its actual use on the assessment date. *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 725, 801 P2d 809 (1990). Contrary to Gill's position, the banking industry still uses data/operations centers. His five income comparables indicated as much. While today's data centers may be smaller, the basic function is still there.

---

[3] In calculating the cost of the electrical components, Gill mistakenly used the structural cost of $6,162,730 when he should have used electrical cost of $9,046,763. As a consequence, his deduction should have been $16,651,571.

The court believes Gill was too influenced by taxpayer's plans to "close" the computer center. Also, the court is not persuaded that computer systems are so individualized that "most users would build a facility to suit their new equipment rather than try to fit it into an existing space designed 7 to 10 years earlier." It appears that every computer center will need raised floors, cooling systems, a UPS, and other features.

On the other hand, the court does not entirely accept Zurawski's view. She states in her report that "[b]ecause the highest and best use of the property as a data center used all of the property's special attributes, no superadequacies were identified and no consequence deductions were made." It is clear that of the two 1,200-ton chillers, one was never used by taxpayer and the other was only rarely used. Most of the time, the 500-ton chiller was adequate. The court finds that one 1,200-ton chiller is completely adequate, which leaves 1,700 tons of chilling capacity as excess.

Taxpayer never used more than 15,000 square feet of the computer center, which means that 50 percent of the computer center was not used, even when it was operating as a data/operations center. In addition, there is an excess 17,000 square foot expansion area that has special features such as a two-foot raised floor and special air ducts and wiring that have never been needed.

With technology moving in the opposite direction, the oversized cabling, conduits, and some of the other structural aspects were obsolete before the building was even completed. As a result, not all the planned electrical generators were installed, leaving excess space, excess load capacity, and other features that have never been used.

In addition to the features not used or vastly underused, the evidence raises questions about the market value of other assets. For example, the UPS system, ground mat, underground tanks, extraordinary seismic construction, and extensive duct work for the heat and air conditioning system may have some use, but would those features be duplicated by the market as of the assessment date? On the whole, the structure appears to reflect the banking industry's

dated vision of a great and spacious building in which to conduct its tribute to mammon. The high ceilings, high-quality finish and fixtures, high standards for safety and comfort, and high expectations for visual and aesthetic appearance have diminished market value due to energy conservation, technology, mergers, and other changes in the industry.

## RECONCILIATION

Zurawski's opinion of approximately $125 per square foot rests on the theory that the property is 100 percent used. Gill's estimate of $90 per square foot represents an office building without the subject's extraordinary features. The difference between the two estimates is roughly the amount Gill deducted as functional obsolescence.

The court finds this dispute difficult to resolve, in part because the evidence as to technology is not as precise and market-related as desired. Also, it is easy to confuse changes in computer technology with changes in building technology because they are so interrelated. For example, moving to networked personal computers and small mainframes may not affect the need for a UPS but certainly it affects the cabling and cooling requirements of the building.

Based on the evidence, the best judgment of the court is that 50 percent of the computer-related special features remain valuable. Although two-foot-high raised floors may not be necessary, raised floors of some height are necessary. Likewise, although the subject building may not need 2,900 tons of chilling capacity, it does need some chilling capacity. It may not need cables of the existing load capacity but it does need some cables. The cost to install such features with less capacity but of absolute necessity must at least equal 50 percent of the total cost.

Based upon Gill's estimated replacement cost less depreciation and using the corrected amount for the computer center of $16,651,571, a deduction of 50 percent instead of 100 percent results in an indicated market value of $41,782,931. It is not feasible to make the same kind of calculation for Zurawski's appraisal. In her cost approach, she added only $2,000,000 for the special features. Her RCN was significantly less than Gill's. Deducting the $2,000,000 from

her RCN, less depreciation, results in an indicated value of $43,900,000 for the improvements.

The court has also considered the income approach and particularly looked at the net income for bank operation centers. Those leases ranged from $.52 to $1.10 per square foot. In particular, Gill's fifth comparable, the U.S. Bank Center in St. Paul, was built in 1992 and contains 361,700 square feet. Its triple net lease rent was $.96 per square foot. Using Gill's income approach method and capitalization rate, $.96 per square foot for the subject property would give an indicated value of $38,921,353. The court believes this is a good comparable to use due to the similarity in time of construction, size, and function. The only question the court has is whether the $.96 represents a market rate of income as of July 1, 1997.

After considering all of the evidence of value submitted by both parties, the court finds that the RMV of the subject property as of July 1, 1997, was $40,500,000. This attributes less than 50 percent of the value or cost of the computer special features to the property, at least as measured by Gill's estimate. The court believes that Gill's estimate of $16,651,571 is too high. Therefore, attributing a lesser amount to those special features would result in a lesser value. Also, the value found by the court implies a net rent of $1 per square foot (rounded). That indicated amount implies there is some value still in the outdated features but also recognizes there is significant obsolescence. Judgment will be entered consistent with this Opinion. Costs to neither party.