IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| PARKWAY WOODS BUSINESS PARK, LLC, and XEROX CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 160007C |
| v. | ) ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiff Parkway Woods Business Park, LLC ("Parkway Woods") appealed the 2015–16

tax roll real market values of accounts 05025757, 05025755, 00805061, and 00805613

(collectively, the subject property), which compose the bulk of the campus in Wilsonville

formerly owned entirely by Plaintiff Xerox Corporation ("Xerox").[2] A trial was held on

September 12, 2016, in the courtroom of the Oregon Tax Court. James Poliyanskiy, agent of

Ryan, appeared and testified on behalf of Parkway Woods.[3] Joseph Laronge, Senior Assistant

Attorney General, appeared on behalf of Defendant. Darrell W. Deglow, MAI, Principal

Appraiser Analyst of the Department of Revenue, testified on behalf of Defendant. Parkway

Woods' exhibit 18 was admitted with objection.[4] Defendant's exhibits A and B were admitted

without objection.

---

[1] This Final Decision incorporates without change the court's Decision, entered April 27, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] The entire campus contained an additional 0.98-acre account that was not appealed.

[3] The court allowed Poliyanskiy to testify as an expert over Defendant's objection because Poliyanskiy was an Oregon registered appraiser. Poliyanskiy emphasized that he appeared, not as an appraiser, but as an agent of his company. Whatever the significance of that distinction, it did not affect his obligation to testify truthfully.

[4] Plaintiffs did not offer exhibits 1 to 17.

After trial, the court sent a letter to the representatives of Parkway Woods and Defendant, inviting briefing on the question of the court's jurisdiction to determine the value of that portion of the subject property not sold by Xerox. Xerox then named James Poliyanskiy as its authorized representative and requested to join as a party. The court granted Xerox's request in its Order Joining Xerox Corporation, issued January 6, 2017, and incorporated herein.

## I.  STATEMENT OF FACTS

The following is a summary of the facts most helpful to the court's analysis. Additional details from the evidence presented are introduced in the relevant portions of this decision.

The subject property consisted of three large buildings on a 137-acre campus: Building 63 (239,954 square feet), Building 83 (205,722 square feet), and Building 60–61 (385,355 square feet). (Def's Ex A at 19, 25.) The campus was located on Interstate 5, approximately 18 miles south of Portland and 30 miles north of Salem. (*Id*. at 19.) It was developed by Tektronix, Inc., which constructed the buildings between 1975 and 1983. (*Id*. at 25.) Xerox bought the subject property in September 1999 as part of its acquisition of Tektronix's Color Printing and Imaging Division. (*Id*.)

Xerox still owned the entire campus on the assessment date, January 1, 2015. (*See* Ex A at 13.) In December 2015, Xerox sold the portion of the campus containing Buildings 60–61 and 83 to Parkway Woods for $32,700,000; Xerox retained Building 63. (*Id*.)

The parties each valued the subject property by applying the income and sales comparison approaches. Due to the buildings' age, neither party's expert used the cost approach. Plaintiffs stipulated at trial to the value of Building 83 reached by Defendant's appraiser: $10,832,725.[5] (*See id*. at 94.)

---

[5] For consistency, the court refers to Plaintiffs even though Xerox joined after completion of the trial.

On the assessment date, Building 63 was wholly occupied by Xerox. (*Id*. at 15.)
Building 60–61 was partly occupied by Xerox, partly occupied by another tenant, and partly
vacant. (*Id*. at 13-14.) The space within the two buildings was configured as follows.

| *Building* | *Office* | *R & D* | *Mfg.* | *Whse.* | *Other* |
|---|---|---|---|---|---|
| 60–61 | 75% | 18% | 5% | 1% | 2% |
| 63 | 55% | 19% | 20% | 4% | 2% |

(*See* Def's Ex A at 25.)

A.      *Plaintiffs' Evidence of Value*

Plaintiffs' appraiser—Poliyanskiy—declared at trial that his work product was not an
appraisal, and he captioned it "Assessment Evidence." (Ptfs' Ex 18.) Plaintiffs' evidence
included charts summarizing Poliyanskiy's application of the income capitalization and sales
comparison approaches. (*Id*. at 22–24.) Those charts were accompanied by maps, color
photographs of the subject property, excerpts from market studies, and summary reports on
specific property transactions and listings.

In his sales comparison approach, Poliyanskiy valued Buildings 60–61 and 63 together,
combining their square footage and comparing them collectively to five other properties sold
between September 2014 and February 2016. (*Id*. at 24.) Those five properties were identified
as the Lattice Campus in Hillsboro, the Dupont Corporate Center in Dupont, Washington, the
Ambassadors Building in Spokane, Washington, the Oregonian headquarters in downtown
Portland, and the Weyerhaeuser headquarters in Federal Way, Washington. (*Id*.) The buildings
ranged in size from 133,420 square feet to 1,010,000 square feet. (*Id*.) Poliyanskiy made gross
adjustments ranging from 5 to 20 percent for location, year built, and building quality. He
assigned equal weight to each comparable and concluded to a value of $61.97 per square foot for
both Building 60–61 and Building 63. (*Id*.)

Poliyanskiy's income approach applied identical parameters to both Building 60–61 and Building 63: the same rent per square foot ($0.63 per month or $7.56 per year), the same vacancy and credit loss percentage (11.0 percent), the same operating expense percentage (8.0 percent), and the same overall capitalization rate (8.00 percent). (*See id*. at 22–23.) In support of the numbers he chose, Poliyanskiy submitted market studies and seven Ryan/CoStar "Lease Comp Reports." Those reports included one report of a leasing transaction and six reports of asking rents. (Ptfs' Ex 18 at 64–72.) The only market study reporting on rent rates was from CBRE and covered the Portland industrial market during the first quarter of 2015. (*Id*. at 37–40.) That study stated that, for flex space, "the majority of spaces range from $0.80 to $0.90 triple-net"—with "rates well north of $1.00 in newer, well-located facilities." (*Id*. at 39.)

After capitalizing each building's net operating income, Poliyanskiy deducted a "lease up to stabilization" adjustment to the indicated value. (*Id*. at 22–23.) That "stabilization" adjustment ranged from approximately $4 to $6 million, and was calculated on the basis of a 29 percent vacancy. (*Id*.) The CBRE study reported a southwest Portland area business park industrial vacancy rate of 8.6 percent. (*Id*. at 38.) Poliyanskiy's income approach concluded to values of $60.78 per square foot for each building. (*Id*. at 22-23.)

Poliyanskiy ultimately concluded that Building 60–61 should be valued at $23,650,000 and that Building 63 should be valued at $14,730,000. (*Id*. at 2.)

B.    *Defendant's Evidence of Value*

Defendant submitted an appraisal and a packet of material obtained from Plaintiffs. That additional material included, among other things, the 2015 purchase and sale agreement and an "information memorandum" prepared by ScanlanKemper-Bard (SKB). (Def Ex B.) The memorandum reported that SKB was an investor in the purchase of the subject property and that

SKB was slated to manage Buildings 60–61 and 83 after their purchase. (*Id*. at 231.) SKB's memorandum included its business plan with respect to the subject property, its year-by-year projection of cash flow and rates of return, and the comparable sales and leases upon which it based its projections. (*Id*. at 231–240.) One objective of the business plan was to "[r]eposition the [p]roperty from an owner/user corporate campus to a true multitenant business park through the investment of $3.7 million in capital improvements, including the addition of individual tenant storefronts and entrances, upgraded signage and tenant amenities, and the sub-metering of building utilities." (*Id*. at 229.) The SKB memorandum stated that an existing rent in Building 60–61 at $7.60 per square foot was 38 percent below the market rate. (*Id*. at 250, 227.)

Defendant's appraiser—Deglow—concluded that the highest and best use (HBU) of Building 60–61 was undergoing a transition on the date of assessment. (Def's Ex A at 86.) He testified that because the building was so large, and because of the transition in its HBU, he was unable to locate satisfactory comparable sales for Building 60-61 alone. He concluded that the December 2015 sale was the best indicator of value for Buildings 60-61 and 83 together. He then used the sales and income approaches to value Building 83 and subtracted Building 83's value from the sale price (adjusted for deferred maintenance). (*Id*. at 88.) Using that "residual" method, he concluded that Building 60–61's value was $25,867,275. (*Id*. at 95.)

Deglow concluded that the HBU of Building 63 was to remain occupied by Xerox and used for Xerox's purposes. (*Id*. at 86–87.) For his sales approach, he identified four single-tenant office buildings, two with labs, research and development space, and shipping and receiving. (*Id*. at 106.) His gross adjustments to those comparable sales ranged between 25 and 55 percent. (*Id*. at 111.) He concluded under the sales approach to a value of $28,800,000 for Building 63. (*Id*. at 112.) He reached a value of $27,115,000 based on the income approach—

using three lease comparables—but did not rely on that approach in his final reconciliation because Building 63 had been owner-occupied since its construction. (*Id*. at 120–21.)

The sum of the subject property's 2015–16 total tax roll values was $62,492,410. (*Id*. at 6.) Plaintiffs requested reductions in the individual tax roll values that would reduce the total to $38,565,337. (Compl at 1.) Defendant requested that the tax assessment be upheld. (Answer at 1.)

## II.  ANALYSIS

The issue in this case is the value of Buildings 60–61 and 63 for tax year 2015–16. Plaintiffs agreed to Defendant's determination of Building 83's value.

Parties asking for a change in the real market value on the tax roll must prove they are entitled to it by a preponderance of the evidence. *See* ORS 305.427.[6] Such a party must present "competent evidence" of the value of the property on the assessment date in question. *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence includes "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences," as well as expert testimony from real estate professionals. *Danielson v. Multnomah County Assessor*, TC–MD 110300D, WL 879285 (Or Tax M Div Mar 13, 2012).

A.    *Highest and Best Use*

In any appraisal, "[t]he first question that must be addressed * * * is the question of highest and best use (HBU) of the property subject to valuation."[7] *Hewlett-Packard Co. v. Benton Cty. Assessor*, 21 OTR 186, 188 (2013), *aff'd*, 357 Or 598, 356 P3d 70 (2015), citing *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 801 P2d 809 (1990). The HBU

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

[7] " 'Highest and best use,' means the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." *Former* OAR 150-308.205-(A) (2015), *renumbered as* OAR 150-308.0240 (2016).

helps define the set of comparable properties out of which comparable sales and income-related data are identified. *Id*. While in many cases there is no dispute that a property's HBU is its current use, in periods of transition within the general economy or a given industry, "an analysis of HBU is absolutely necessary." *Id*. at 189.

The categories of HBUs are not well-defined, although they presumably include the property types found in market studies, which divide up industrial properties into categories such as flex, research and development, and warehouse. Beyond those categories, the distinction between multitenant use and owner occupation is a critical aspect of HBU. *See Freedom Federal*, 310 Or at 727-28 (finding no comparable properties among sales reviewed by appraiser who had erroneously concluded office building's HBU was multitenant rather than owner headquarters); *Hewlett-Packard*, 21 OTR at 193 (placing "little or no weight" on comparable sales analysis done by appraiser who erroneously determined HBU of industrial property was multitenant rather than owner occupation).

Here, Poliyanskiy characterized the HBU of both Buildings 60–61 and 63 as flex industrial. While he did not provide a written analysis of HBU, his evidence suggests that he reasoned from the buildings' physical similarities. A majority of each building was configured as office space, and roughly 20 percent of each building was configured for research and development. Building 63 had somewhat less office space and somewhat more manufacturing space than 60–61. The photographs submitted by Plaintiffs show the two buildings' many similar features. Considering that the buildings' locations were virtually identical as well, Poliyanskiy's HBU finding is plausible. However, it is not complete because it does not account for the difference between owner occupation and multitenant use.

/ / /

Both Buildings 60–61 and 63 were originally designed for use by a single owner-occupant. The evidence shows that, on the assessment date, Building 60–61's HBU had changed from that original purpose. On that date, Building 60–61 was partly owner-occupied, partly leased to another tenant, and partly vacant. The building was sold to a speculative investor within the year—a sign of a market in transition. *See* Appraisal Institute, *The Appraisal of Real Estate* 342 (14th ed 2013). The building's new management announced that their strategy was to "[r]eposition the [p]roperty from an owner/user corporate campus to a true multitenant business park." That announced intention was supported by an analysis of targeted returns and cash flows. (Def's Ex B at 233–34.) In light of the above, the court finds that Building 60–61's HBU was multitenant flex industrial on the assessment date.[8]

The parties did not present evidence that Building 63's HBU had changed to multitenant use in the way that Building 60–61's had. Evidence was presented that advances in semiconductor technology and production costs had largely rendered older, owner-occupied high-tech manufacturing campuses such as the subject property obsolete. However, the fact remains that Xerox continued to fully use Building 63. It is possible that Xerox's use of the property was not maximally productive, and that reconfiguration for multitenant use would have been a more productive use. But no evidence of that possibility was submitted. Neither party submitted a feasibility analysis comparing the costs and benefits of continued owner occupation

---

[8] At trial, there was some discussion as to whether the HBU of Building 60–61 had already changed to multitenant use on the assessment date, or whether its HBU was in an undefined transition state. The regulations do not contemplate a transition state. HBU is defined as "the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." *Former* OAR 150-308.205-(A)(1)(e) (2015), *renumbered as* OAR 150-308.0240(1)(e) (2016). A property's HBU "may include, among others, all possible uses that might result from retaining, altering or ceasing the integrated nature of the unit of property." *Former* OAR 150-308.205-(A)(2)(i) (2015). The regulations indicate that an HBU may be a potential use that would result from altering that property. It is therefore not necessary that alterations be complete—or even begun—for a property's HBU to have changed. A changed HBU, once discerned, provides the goal for the subsequent reconfiguration.

of Building 63 to the costs and benefits of reconfiguration for multitenant use. Barring such evidence, Xerox's continued occupation of Building 63 is persuasive. The court finds that Building 63's HBU was still owner occupancy on the assessment date.

B.    *Plaintiffs' Evidence of Value*

Poliyanskiy's sales comparison approach valued Buildings 60–61 and 63 together, as a single property. That approach generates problems for his valuation, given the court's finding that the two buildings had different HBUs. For the court to evaluate the comparability of the sales he reviewed, it would need information that showed each property sold was simultaneously suitable for both multitenant use and for owner occupancy. That information was not provided.

In fact, Poliyanskiy's application of the sales comparison approach is questionable regardless of the court's HBU determination. He did not adjust any of his comparable sales for size. That is despite listing properties with improvement areas varying between 133,000 and 1,010,000 square feet. And, without analysis, he gave equal weight to each of his comparable sales: 20 percent to the Hillsboro industrial campus (built 1984–1999) that sold for $78 per square foot, 20 percent to the downtown Portland office building (built 1947) that sold for $39 per square foot, 20 percent to the million-square-foot corporate center in Dupont, Washington (built 1996) that sold for $40 per square foot, and so on. Placing equal weight on properties of such varying ages, location, and size would require explanation that Poliyanskiy did not provide.

Poliyanskiy's income capitalization approach likewise does not reflect the different HBUs of Buildings 60–61 and 63. He applied exactly the same parameters in his valuations of both buildings: the same potential rent per square foot, the same vacancy and credit loss percentage, the same operating expense percentage, and the same overall capitalization rate. No analysis was provided for any of those parameters, but an examination of just one shows that his

number is unreliable. Poliyanskiy asserted a potential rent of $0.63 per square foot per month, or $7.56 per square foot per year. To support that potential rent, he submitted seven CoStar lease comparable reports without analysis. (Ptfs' Ex 18 at 64–72.) One of the seven properties reported an effective triple net rent of $7.27 per square foot, the others reported asking rents ranging from $6.96 per square foot to $10.80 per square foot. The lease comparable reports identified the types of the properties variously as "industrial" or "flex"; no more specific information about the nature of the buildings was supplied. The court does not have enough information to evaluate whether the properties leased and offered for lease were comparable to both a multitenant and an owner-occupied building.

In contrast to rates used in Poliyanskiy's income approach, the CBRE market study stated flex spaces in Portland were leasing at a range "from $0.80 to $0.90 triple-net"—with "rates well north of $1.00 in newer, well-located facilities." (Ex 18 at 39.) What is more, Building 60–61's new management stated that a lease rate of $7.60 per square foot per year in Building 60–61 was 38 percent below market rate. (Ex B at 250, 227.)

Additionally, after capitalizing the net operating income, Poliyanskiy deducted a large figure—$4 to $6 million—for "lease up stabilization." (*See* Ex 18 at 22–23.) The court notes that discussion of discounting net income loss during lease-up when using the income capitalization approach appeared in the eleventh edition of *The Appraisal of Real Estate* but not in subsequent editions. *Cf*. Appraisal Institute, *The Appraisal of Real Estate* (14th ed 2013). Even in the eleventh edition, owner-occupied properties were excluded from the discussion. Appraisal Institute, *The Appraisal of Real Estate* 580 (11th ed 1996). Regardless of whether such an adjustment is ever warranted, Poliyanskiy's application of it here is not credible. He calculated the stabilization adjustment using the same parameters for both buildings—parameters

that included a 29 percent vacancy. That was the actual vacancy of Building 60–61 on the assessment date; Building 63 was fully occupied. If the adjustment was meant to be based on actual vacancies, then applying Building 60–61's vacancy rate to Building 63 was an error. If the adjustment was meant to be based on the market, no supporting evidence was provided. To the contrary, the CBRE study stated the market vacancy rate was 8.6 percent.

In light of the above, the court cannot place weight on either of the approaches to value submitted by Plaintiffs. Plaintiffs have not borne their burden to show the tax roll value should be reduced.

C.       *Defendant's Evidence of Value*

Although Plaintiffs have not shown that the roll value should be lowered, and although Defendant has not requested that the roll value be raised, this court has jurisdiction to determine the correct value of the subject property based on the evidence presented. *See* ORS 305.412. With respect to an increase in roll value, Defendant must bear the burden of proof by a preponderance of the evidence. *See* ORS 305.427.

The court bears in mind that real market value is a range of value, and that a 10 percent variation is generally accepted among appraisers' conclusions. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). Here, Defendant submitted an appraisal concluding to a value for the subject property only 4.8 percent above the roll value. Even if that value conclusion were entirely persuasive, the difference between it and the tax roll value is less than the inherent uncertainty in any appraisal. Under such circumstances, the court does not find evidence that the tax roll is in error.

/ / /

/ / /

/ / /

### III. CONCLUSION

After careful review of the evidence presented, the court concludes that Plaintiffs failed to carry their burden of proof. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of May, 2017.

POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on May 18, 2017.*