# IN THE OREGON TAX COURT

## FRED MEYER, INC.
*v.*
## DEPARTMENT OF REVENUE
(TC 3049)

Milo E. Ormseth and Gregory R. Mowe, Stoel Rives Boley Jones & Grey, Portland, represented plaintiff.

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered November 20, 1991.

**CARL N. BYERS, Judge.**

Plaintiff appeals the value of its headquarters property for the years 1988 and 1989. After an administrative hearing, defendant set the value of the property at $3,875,000. Plaintiff contends that the value for each of the years is no more than $2,300,000. Although this appeal concerns the value of land and improvements, the parties

agree the value of the land is $700,000. Consequently, the dispute is over the value of the improvements.

The improvements are on 5.62 acres, fronting on Southeast 22nd Avenue between Powell and Holgate Boulevards in Portland. The property is in an industrial zone, inhabited mostly by older industrial buildings. A railroad yard and cement batch plant are located across 22nd Avenue, with warehouses and manufacturing facilities on the other three sides.

The history of the improvements is consistent with this older industrial neighborhood. The main building was constructed in 1924 as a three-story warehouse. It contains approximately 117,439 square feet, 110,723 of which has been made into office space and 6,716 square feet is unfinished storage. Also in 1924, a single-level concrete office-warehouse was added to the rear of the main building. This addition contains 41,695 square feet, 13,505 square feet being used for production and 28,190 as unfinished warehouse. In 1929, a concrete two-story office building was added to the front of the main building. This building contains 10,224 square feet, approximately half being used for a cafeteria and half for office space. In 1952, a metal-clad warehouse containing 4,500 square feet (defendant shows 6,251 square feet) was added to the east end of the single-level concrete warehouse.

The conversion of much of the warehouse space to office space has taken place over time. As of the assessment dates in question, approximately 67 percent of the total 173,858 square feet was used for offices. The remaining 33 percent was used for a print shop, the cafeteria, maintenance, warehouse and a workshop.[1]

The central issue in this case is the property's highest and best use. While the parties agree upon the definition of the concept, they disagree upon its application. Plaintiff sees the property's highest and best use as warehouse, with typical office space of 10-15 percent. This approach requires "substantial demolition and renovation" to convert much of the

---

[1] There are some disparities in the measurements used by the parties. Defendant shows a total building area of 161,653 square feet and indicating that approximately 60 percent of the improvements is used for offices.

office space to warehouse. Defendant, on the other hand, sees the highest and best use of the property as offices, with the present associated warehouse and other uses. Defendant's appraiser does not believe the market would convert the offices into warehouse space because there is warehouse space readily available.

The issue is a difficult one. It is made more so by the fact that plaintiff has grown large while remaining in the same property, modifying the property over time to fit its needs. The situation is like the teenager whose bedroom is a converted garage. When the teenager is gone, should the area be left as a bedroom or be converted back to a garage? The concept of highest and best use answers that question by determining which use creates the highest value in the marketplace.

The concept of highest and best use is based on market forces.

"When the purpose of an appraisal is to estimate market value, highest and best use analysis identifies the most profitable, competitive use to which the property can be put. Therefore, highest and best use is a market-driven concept." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 269 (9th ed 1987).

There are a number of factors supporting plaintiff's position. The subject is not in an office building neighborhood. The area lacks convenient services such as restaurants, mass transit, and other amenities normally associated with office areas. Likewise, neighboring uses, such as the cement batch plant, the railroad yard and others, discourage office use. The subject site does not provide adequate parking area for its present office use. While plaintiff leases adjoining parcels to provide additional parking, it is a complicating factor in determining the highest and best use of the subject.

One of the most important factors is the layout of the improvements. The conglomeration of buildings is not readily adaptable to multi-tenant use. No evidence was submitted to establish the costs of remodeling the property to make it suitable for multi-tenant use. Such costs would have to be compared to the demolition costs to convert the property to primarily warehouse use. The evidence showed there is no

market in this neighborhood for single tenants the size of plaintiff. It requires a large number of employees to utilize the subject offices.

In support of defendant's position, the market appears relatively weak for either office or warehouse use. In a slow market, it may well be prudent for the owner or appraiser to select that option which incurs the least expense. Thus, to continue using the office space may create a higher value than investing additional capital to create an alternative use.

■ After reviewing the evidence the court finds the plaintiff's position, with regard to the highest and best use of the property, is correct. Defendant's appraiser appeared unduly influenced by plaintiff's use of the property. What must not be forgotten is that the test of true cash value is a **market** test. It does not matter whether a property is overused or underused by a particular owner. The question is: What use would the market make of that property? For example, defendant assumed the market would continue the restaurant use. However, the appraiser did not know whether the restaurant is subsidized by plaintiff. The neighborhood does not appear to be an area where an independent party would locate a restaurant. Likewise, defendant had no data to support large offices being located in this area. The absence of such data suggests that this area is not appropriate for large office use.[2]

Defendant's position seems influenced by *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 801 P2d 809 (1990). The property in that case was a special-use building designed and built as a bank headquarters. There, the plaintiff's appraiser, as well as the defendant's, found use as a bank headquarters produced the greatest value.

■ The test of highest and best use is not a mechanical application of whether a use is physically possible, legally permissible, financially feasible and maximally productive.

---

[2] In valuing the land as if vacant, defendant's appraisal report states:

"It is assumed, that if the subject [land] were vacant and available for development, the most likely option for development includes improvements of multiple and single tenant warehousing with typical office ratios, which is most popular in this area."

Rather, those factors must be related in each instance to the market conditions involved.

> "For example, market analysis may indicate the need for a large office building in a community. If the subject site is surrounded by modern, single-family residential developments, however, a large, multistory office building would probably not be logical, even if it were legally permitted. Similarly, a housing development for the elderly might be a permissible use for a site, but if most residents of the area are under 40 years old, this use may be illogical and would probably not meet the criterion of financial feasibility." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 277 (9th ed 1987).

Again, the test is a market test. One might ask: Is the current use, which defendant maintains is the highest and best use, representative of the market? The court does not believe it is. Plaintiff, as a tenant, is not typical of tenants in this neighborhood nor is its use of the property typical of the uses in this neighborhood.

There are other considerations. The current use of the property is a nonconforming use under the zoning laws. That is, if the property were to remain completely vacant for two years, the zoning could limit or require a conditional use permit for office space use, depending on the primary use or uses of the property. This is a factor to consider. If the market sees the highest and best use of the property as a warehouse with typical office space, there is no risk associated with zoning restrictions. However, if the market sees the highest and best use of the property as it is, it must recognize the risk associated with possible vacancy. Defendant's appraiser admitted that there was substantial risk, maybe a high probability, that the property would be vacant for two or more years. In making that concession, he noted that the White Stag property and some other properties had been vacant for five years.

It should be noted that plaintiff's estimated demolition cost for converting most of the office space to warehouse space is estimated at $50,000. Defendant's witness, in rebuttal testimony, stated that he estimated demolition cost at $175,000. Defendant's estimates of value avoid these costs only by assuming that the plaintiff's current use is typical of

the market. If defendant is wrong, then those conversion costs must necessarily be incurred, whether they are $50,000 or $175,000.

The piecemeal conversion of the property by plaintiff from warehouse space to office space has resulted in a poor layout. The unusual traffic patterns and layout of the building diminish the quality of its use for offices. Likewise, inadequate restroom facilities and insufficient number of elevators underscore the awkwardness of plaintiff's use. They also introduce a rigidity which prevents the building from being readily adaptable to multitenant use.

Defendant appears to believe that the use of the property on the assessment date is critical. Again, defendant relies upon *Freedom Federal*. In that case, the Oregon Supreme Court stated:

> "Although the savings and loan industry may have been weak, *on* the assessment dates taxpayer fully occupied the property as its headquarters. Whether the highest and best use would continue to be a financial institution's headquarters *after* the assessment dates is irrelevant." 310 Or at 726.

While the use of property on a particular assessment date is evidence of market use, it is not conclusive. Highest and best use is determined by the market, not by a particular user or taxpayer. In *Freedom Federal*, the headquarters building was designed specifically as a bank headquarters building. Although the market for such buildings was weak as of the assessment dates, that was the highest use indicated by the market forces.

In contrast, plaintiff's use of the subject property is not representative of the market. To the contrary, this is a case where the user of the property makes a more intense use of the property than the market. The market value of a property is not based on an excessive use any more than it is based on an excessive rent. An estimate of true cash value rests on the market's probable use of the property at an economic rent. Uses or rents which are extremes and not representative of the market must be eliminated from consideration.

In his testimony, defendant's appraiser viewed the subject property as an "exceptional building." The court

finds that the subject is not an exceptional or even a satisfactory headquarters building. As noted above, the elevators and the restrooms are inadequate. Although defendant admitted the parking was inadequate, he saw it as such only because of "overuse" or "overoccupancy" of the building. These terms suggest that the use of the property is not representative of the market and, therefore, may be not consistent with its highest and best use.

Having determined that the highest and best use of the property is as a warehouse with associated office space, it is necessary to determine its true cash value. Both parties' appraisers utilized the income approach and the market or sales comparison approach.

Plaintiff's income approach was based on a market study to determine typical or economic rent. Plaintiff's appraiser estimated a triple-net rent of 14 cents per square foot per month for warehouses. When this amount is multiplied by 153,634 square feet it produces an annual income of $258,105. Likewise, he estimated office rent at 25 cents per square foot per month for 20,224 square feet, producing $60,672 per year. From the potential annual rent, he deducted ten percent for vacancy and credit loss. He then deducted five percent from the gross annual rent for professional management and reserves for replacement, leaving a net income of $272,554. Dividing this by a capitalization rate of 11 percent, gave an indicated value of $2,478,000. From this he deducted $50,000 for demolition cost, arriving at an indicated market value of $2,428,000.

After considering a number of comparable sales, plaintiff's appraiser determined that the overall sales price of the improvements would be $7 per square foot. Multiplying 173,858 square feet by $7 resulted in a value of $1,220,000 for the improvements. To this he added land value of $730,000 and deducted demolition cost of $50,000, resulting in a total indication of value of $1,900,000.

Defendant's appraiser also used the income approach and the market or sales comparison approach. In his income approach, he estimated rent for the various present uses. He estimated rent of 33 cents per square foot per month for offices, 25 cents per square foot for the restaurant,

nine cents per square foot for unfinished storage, 17 cents per square foot for warehouse, 10 cents per square foot for the metal-clad building, and five cents per square foot for covered open storage, giving him a total annual rent of $498,617 for the total 161,653 square feet. This produced an overall average of approximately 26 cents per square foot per month. Defendant noted that this compares favorably with the 25 cents per square foot per month the plaintiff actually pays. From this, the appraiser deducted 10 percent from potential annual rent for vacancy and credit loss. He also deducted five percent from gross rent for management and reserves, resulting in a net income of $426,317. He divided this amount by 11 percent, which resulted in an indicated value of $3,875,616 or $3,875,000 rounded.

In the sales comparison approach, defendant's appraiser found comparable sales giving an indicated range of value of $29.20 per square foot to $53.02 per square foot for office space. However, a major weakness in defendant's work was brought out on cross-examination. Defendant's appraiser did not separately account for land values in making his adjustments. This failure made the comparison of building costs unreliable. That is, by comparing properties based on sales which include land, any disparity in land values can result in attributing land value to buildings or building values to land. All of defendant's office space comparable sales are on higher value land than the subject. By not adjusting for this difference, defendant inflated the subject's indicated value on a per square foot basis. Defendant's appraiser considered sales number three and four as his most comparable. Removing the amounts for the higher land value lowers the effective sale price per square foot from $35.71 to $30.65 for number three and from $47.83 to $42.09 for number four. The appraiser had made an average adjustment in value for numbers three and four of 28 percent. Reducing the corrected sales prices by 28 percent leads to a $26.19 value per square foot for the subject, or a reduction of $373,640.

In reviewing the evidence, the court finds that both appraisers agree upon the capitalization rate (11 percent), upon a vacancy and credit deduction (10 percent) and upon reserves and management deduction (five percent). They disagree on the highest and best use of the property and on

the triple-net rent attributable to both offices and warehouses. Defendant uses 33 cents a square foot for offices while plaintiff uses 25 cents per square foot. Defendant's office rent comparables are all significantly smaller and fail to consider the effect of vacancies on overall prices. The court also believes that defendant did not make adequate adjustments for the subject's neighborhood, parking and the market conditions. Likewise, defendant uses 17 cents per square foot for warehouses, while plaintiff uses 14 cents a square foot. It is undisputed that plaintiff pays less than 14 cents a square foot to rent a neighboring property twice as large as the subject. Larger properties, such as the subject, will rent for less per square foot than the smaller properties.

Based on the above findings, the court concludes that the plaintiff's income approach indication of value is the most accurate. Therefore, the court finds that the true cash value of the subject property as of January 1, 1988, and January 1, 1989, was $2,428,000. Costs to neither party.