DECISION
Plaintiff appeals the 2010-11 real market value of property identified as Account 1737574 (subject property). A trial in the above-entitled matter was held by telephone on August 8, 2011. David W. Sohm (Sohm), Registered Appraiser, appeared and testified on Plaintiff's behalf. David E. Carmichael (Carmichael), Attorney at Law, appeared on Defendant's behalf. Richard J. Duncan (Duncan), SRA, MAI, testified on Defendant's behalf.
Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection.
Duncan's request for a transcript of the trial proceeding was denied pursuant to ORS 305.430(1)[1], which provides that "[p]roceedings before the magistrate division shall not be reported."
 I. STATEMENT OF FACTS
The subject property is a concrete tilt-up "industrial building" located on 4.44 acres of land in Eugene, Oregon. (Ptf's Ex 1 at 2.) Built in 1958, the building served manufacturing purposes before it was converted into a warehouse, and the building now doubles as a warehouse and office space. (Id.) The building area is 94,050 square feet, of which 13,600 square feet is office space. (Id.) The property has a 2.06:1 land to building ratio. (Id.) The wall height of the *Page 2 
building ranges from 30 feet in a "center section that is 125 feet wide," to 22 feet in two 50-foot sections on each side of the center section, and to 12 feet in the "office section," which is also 50 feet wide. (Id.) Both parties agree that the highest and best use of the property is industrial development. (Id.; Def's Ex A at 34.)
The building was renovated in 2000 to allow for owner occupancy. (Ptf's Ex 1 at 2.) Its features include a "heavy electrical service for industrial use," infrared radiant heater, loading doors, crane rails, and overhead cranes. (Id.) The surrounding area is zoned as "a combination of retail and industrial uses" and has "exposure to 35,600 vehicles per day * * * *" (Id.)
Plaintiff assessed the subject property at a real market value of $4,232,250 for tax year 2010-11. (Ptf's Compl at 3.) Defendant appealed from Plaintiff's real market value determination to the Lane County Board of Property Tax Appeals, which subsequently issued an order on February 17, 2011 that reduced the real market value of the subject property to $3,300,000. (Id.) Plaintiff timely appealed from that order to this court on March 11, 2011. (Id. at 1.)
Sohm and Duncan each presented appraisal reports for the subject property that utilized the sales comparison and income capitalization methods. (Ptf's Ex 1 at 5-16; Def's Ex A at 36-50.) Both Sohm and Duncan found the sales comparison approach to be more reliable. (Ptf's Ex 1 at 16; Def's Ex A at 50.)
Sohm's sales comparison approach included five properties, only one of which is a concrete tilt-up building similar to the subject property; three of the other comparable properties are metal buildings. (Ptf's Ex 1 at 10-11.) Most of the comparable sale properties were built after the subject property. Even though Sohm's report listed five "sales," the fifth comparable property was not sold but leased with an option to buy. (Id. at 11.) Two of the four actual sales *Page 3 
took place after the appraisal date. (Id. at 10.) Sohm's report gave greatest weight to the post-dated sale of the concrete-tilt up building, which, like the subject property, is located in Eugene and features office space. (Id.) Sohm testified that "that building was offered for lease as well as sale." Sohm primarily relied on the price per square foot of that comparable property, $45.37, to determine a price per square foot of $45 for the subject property. (Id. at 11.) He multiplied that price by his estimation of the square footage of the property, 94,050 square feet, to compute a real market value of $4,232,000 (rounded). (Id.)
Duncan's sales comparison approach included six properties, two of which also appear in Sohm's report. (Def's Ex A at 36; Ptf's Ex 1 at 10.) Of those six properties, only four sales had been completed; one sale was pending, and the "sale" information for the last selected property had been taken from a real estate listing. (Def's Ex A at 36.) Furthermore, "due to a lack of recently closed sales in the local market," Duncan's report included two comparable sales in Roseburg, Oregon, a city located a distance south of the subject property. (Id.) In order to determine the value of the subject property, Duncan first excluded the values of the highest-and lowest-priced comparable properties on the basis of different market and sales conditions. (Id. at 41.) Duncan then compared the four mid-priced properties to the subject property, finding that they "were each * * * low indicators for the subject based on * * * the subject's superior concrete tilt-up construction and superior building height." (Id.) Duncan finally concluded a $35 price per square foot for the subject property, after having given "consideration * * * to the subject's physical and locational characteristics as compared to the sales presented." (Id.) He multiplied that price per square foot times the square footage of the subject property to determine a real market value of $3,310,000 (rounded). (Id.) *Page 4 
Sohm and Duncan each supplemented their sales comparison approach with the income approach. (Id. at 42-49; Ptf's Ex 1 at 12-16.) Their results were close to the values they each determined using the sales comparison approach. (Ptf's Ex 1 at 16; Def's Ex A at 50.) Sohm noted that the subject property had "no income history from leasing," and admitted that his income approach was "based on very limited lease data for properties of the subject type and size." (Ptf's Ex 1 at 12, 16.) However, he concluded that his analysis was "reasonable." (Id.) Likewise, Duncan admitted that "the indicated capitalization rates for all but one of the comparable [leases] were based on estimated income and expenses, which somewhat weakens [the analysis' result]," but he concluded that his analysis provided an "accurate value estimate." (Def's Ex A at 50.)
For his income approach, Sohm selected five "lease comparables" to compare against the subject property. (Ptf's Ex 1 at 12.) Four of those five lease comparables were leased on a "triple net" basis; the other lease comparable was subject to an "industrial gross" lease. (Id.) Two lease comparables were located in Springfield, Oregon, a neighboring city. (Id.) The lease rate per square foot, per month for each lease comparable ranged from $0.24 to $0.45. (Id.) Sohm "estimated that the appropriate lease rate on a triple net basis [for the subject property was] $0.29 per square foot," which "indicate[d] monthly rent of $27,275 and annual potential gross income of $327,300." (Id. at 13.)
Sohm calculated the subject property's "effective gross income" of $294,565 by subtracting 10 percent from the potential gross income, $327,300. (Id. at 15.) He then subtracted three percent for management costs and two percent for "reserves for replacement of short lived items" to arrive at a net operating income of $279,837 before property taxes. (Id.) Finally, Sohm converted "the estimate of net operating income * * * into an indication of [real] *Page 5 
market value by dividing the net [operating] income by the overall capitalization rate [6.5 percent] extracted from the comparable sales," determining a real market value of $4,305,000 (rounded). (Id. at 16.)
Duncan's income approach included six comparable leases of properties located in Eugene, Springfield, and Roseburg. (Def's Ex A at 48.) Like Sohm, Duncan determined a real market value of $0.29 per square foot, per month for the subject property's lease rate. (Id.; Ptf's Ex 1 at 13.) Using that rate, Duncan computed an annual potential gross income of $329,208, which he reduced by six percent for vacancy losses and another six percent for management, replacement reserves, and structural maintenance costs to determine a net operating income of $290,856. (Def's Ex A at 48.)
The major difference between Duncan's and Sohm's income approaches is their individually determined capitalization rate. Using a nine percent capitalization rate, Duncan determined a real market value of the subject property of $3,230,000 (rounded). (Id. at 49.) Duncan explained that:
 "[t]he higher capitalization rates [here] are a reflection of the higher risk characteristics that are associated with larger facilities [like the subject property] * * * [T]he recent softening of the economy and the continuing volatility in the financial market is putting upward pressure on overall rates due to the additional perceived risk, which will also be recognized in selecting an appropriate overall rate for the subject."
(Id.)
Duncan prepared his appraisal report for KeyBank, which had requested an appraisal of the subject property for use in "financing decisions." (Id. at 54.) Sohm questioned the accuracy of Duncan's report on the ground that Duncan had appraised the subject property as if it were vacant instead of owner-occupied. Sohm cited a letter from KeyBank to Duncan that stated "[o]wner-occupied improvements must be valued `as if' unoccupied." (Id. at 57.) Additionally, *Page 6 
Sohm personally inspected one of Duncan's comparable properties and found that it was "dilapidated," concluding it was not comparable to the subject property. Duncan responded, stating that he appraised the subject property at its highest and best use, which he understood to mean as owner-occupied.
 II. ANALYSIS
The issue before this court is the real market value of the subject property for tax year 2010-11. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev.,13 OTR 343, 345 (1995)). ORS 308.205(1) defines "real market value" for both real and personal property as:
 "* * * the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
ORS 308.205(2) provides that real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." Those methods are listed in OAR 150-308.205-(A)(2)[2] as the sales comparison approach, the cost approach, and the income approach. A proper determination of real market value must consider all three approaches, but need not use the results produced by any of them. Id. Neither party considered the cost approach because of the year that the subject property was built.
A. Comparable Sales Approach
Plaintiff used the sales comparison and income approaches to determine a real market value for the subject property. This court first considers Plaintiffs sales comparison approach. OAR 150-308.205-(A)(2)(c) prescribes that in any application of the sales comparison approach, *Page 7 
"only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used." Because the data for Plaintiffs fifth comparable property is based upon a lease, and not a sale, this court places little weight on that sale. Ernst BrothersCorp. v. Dept. of Rev., 320 Or 294, 298, 882 P2d 591 (1994) (holding that "if the sales comparison approach is used, only `arm's-length transactions' that result in sales of properties comparable to the assessed property may be considered.").
"Typically, the sales comparison approach provides the best indication of value for owner-occupied * * * industrial properties" such as the subject property. Wingard v. Lane County Assessor, TC-MD No 030762D, WL 51257 at *2 (Jan 5, 2004) (citation omitted). However, it is important to keep in mind that
 "[w]hen the market contains an insufficient number of transactions to create value patterns, the application of the [comparable sales] approach may be limited or inappropriate. Large, special purpose properties are often insufficiently similar to other properties that have sold recently to allow an appraiser to impute value from them. For such properties, using one or both of the other appraisal approaches usually proves more reliable." (emphasis in original.)
Truitt Brothers, Inc. v. Dept. of Rev.(Truitt Bros.),302 Or 603, 610, 732 P2d 497 (1987) (citation omitted). Plaintiffs sales comparison approach leads this court to question whether Plaintiffs appraisal report includes sufficient recent, reliable transactions to establish a market for the subject property.
Plaintiff provided four comparable sales of industrial properties. Three of those properties significantly differ from the subject property. Those three properties are metal buildings that Plaintiff admits are of "lower quality" construction than the subject property, which is a concrete tilt-up building. (Ptf s Ex 1 at 10-11.) Those same three properties have a smaller percentage of office space — 10, 2.6, and-0-percent, as compared to 14.5 percent for the subject property — and each is smaller than the subject property by at least 17,000 square feet. *Page 8 
(Id.) Most of the comparable properties were built after the subject property. One of those properties sold after the assessment date. (Id.) "Generally speaking, post-assessment date sales are disfavored by the courts because they represent information unknown to prospective purchasers on the applicable assessment date." Wong v.Clackamas County Assessor, TC-MD No 080442C, WL 418598 at *2 (Feb 18, 2009). Plaintiff did not make any adjustments to account for the differences between those comparable properties and the subject property. For the stated reasons, this court finds those comparables to be unreliable and not sufficiently comparable to the subject property.
Plaintiff heavily relied upon one comparable property that Plaintiff "judged to be the best comparable [property] * * * *" (Ptf s Ex 1 at 11.) That property, like the subject property, is a concrete tilt-up building located in Eugene, Oregon with a sizeable percentage of office space (26 percent) that was substantially in excess of the subject property. (Id. at 10.) This court agrees that the concrete tilt-up building is Plaintiffs "best" comparable property. The question now is whether only one comparable sale suffices for a reliable comparable sales approach. In Truitt Bros., the Oregon Supreme Court concluded that:
 "Usually, one sale does not make a market. The basic assumption of the sales comparison approach is that there is sufficient data and information available to provide a pattern or range of indicated value. The sales comparison approach is intended to reflect `the market' and not just one or two buyers. But when the market for
[specific] industrial [] plants is so small, with only three comparable plants in existence, one sale of a practically identical property in the same community may be an adequate indicator of market value.'
302 Or at 609 (emphasis added).
The subject property in Truitt Bros. was a canning factory that processed "pears, green beans and stone fruits."Id. at 605. On the date of its appraisal, only three comparable factories in the United States processed such a combination of fruits and vegetables. Id. at 607. With *Page 9 
regard to a comparable factory built in the same city as the TruittBros. factory, the Oregon Supreme Court commented that the two factories were
 "remarkably similar not only as to their location and the types of fruits and vegetables they process, but also as to their layout and the equipment used in their processing lines as well as to their hourly production rate and annual production capacity. The tax court found that the [comparable factory], while larger, was in fact comparable to the subject property, stating that `on the whole it would appear to be as close a match as could be hoped for in such a specialized industry.'"
Id. at 607-08. Upon those facts, the court accepted the results of a comparable sales approach that included only one comparable property, noting that "[t]his case represents the exception to the general rule."Id. at 610.
Here, the subject property and Plaintiff's one truly comparable property share only one similarity with the properties in TruittBros.: the properties are located in the same city. (Ptf's Ex 1 at 10-11.) This court does not find that Plaintiff's comparable property is "as close a match as could be hoped for" among all owner-occupied industrial buildings with office space. TruittBros., 302 Or at 608. Plaintiff has neither shown that the subject property is as unique as the factory in Truitt Bros. (of which only three like factories existed in the entire United States) nor shown that the subject property and comparable property are sufficiently alike as the Oregon Supreme Court found when comparing the properties' features in Truitt Bros. Id. This court cannot overlook the fact that Plaintiff's one comparable property is less than half the size of the subject property and the office space of Plaintiff's comparable property is almost twice that of the subject property. (Ptf's Ex 1 at 10.) It has been accepted that smaller properties regularly command a higher price per square foot than larger properties. Fred MeyerInc., v. Dept. of Rev., 12 OTR 85, 93 (1991). In sum, this court finds that the maxim "one sale does not make a market" is applicable to Plaintiff's comparable sales approach. Truitt Bros., 302 Or at 609. *Page 10 
B. Income Approach
The court now turns to Plaintiffs income approach. The parties agree that the subject property has no income-producing history. (Ptf s Ex 1 at 12; Def s Ex A at 50.) The Oregon Supreme Court warned that "[t]he income approach * * * requires substantial amounts of particularized, verified data. Gross errors can result if such data are not available." Shields v. Dept. of Rev.,266 Or 461, 465, 513 P2d 784 (1973) (citation omitted). The Oregon Supreme Court also noted the difficulty of applying the income approach to owner-occupied properties and to properties with no income history, two aspects of the subject property in this case. FreedomFed. Sav. and Loan v. Dept. of Rev.,310 Or 723, 729 n 2, 801 P2d 809 (1990) (noting that "[the subject property] was owner-occupied * * * making it difficult to determine market rent, which is necessary for the income approach * * * *");Medical Building Land Co. v. Dept. of Rev.(Med. Bldg.),283 Or 69, 81, 582 P2d 416 (1978) (Thornton, J pro tem, dissenting) ("The so-called `income approach' * * * is not proper under the facts presented here * * * because there is at present no earnings history of [the subject property] to go on.") However, both the Oregon Supreme Court and this court have accepted the results of the income approach in such cases. See Med. Bldg., 283 Or at 76 (accepting income approach where building had no income history); Electro ScientificIndustries (Electro Scientific) v. Dept. of Rev., TC-MD No 040165E, WL 3053314 at *5, 14 (Oct 27, 2006) (accepting results of income and comparable sales approach for owner-occupied building, even though results were "not perfect.") Although owner-occupancy and income history are both relevant factors in a determination of the reliability of Plaintiff s income approach, this court makes its determination on other evidence. Plaintiff obtained a capitalization rate for the subject property "extracted from the [capitalization rates of the] comparable sales." (Ptf s Ex 1 at 15.) This court found *Page 11 
three of Plaintiff's comparable sales to be unreliable and not sufficiently comparable to the subject property. It follows that "[i]f those [comparable] sales are not reliable indicators for the sales comparison approach, they are not reliable for use in determining a capitalization rate for the subject [property]." ElectroScientific, TC-MD No 040165E at *11. That leaves Plaintiff with one comparable property from which to calculate a capitalization rate. One comparable property alone does not provide a "substantial amount[] of particularized, verified data" necessary for the proper use of the income approach in this case. Shields, 266 Or at 465.
C. Burden of Proof
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff seeks affirmative relief and therefore bears the burden of proof. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev, 4 OTR 302 (1971)). Because Plaintiff's comparable sales and income approaches lack reliable comparable sales, Plaintiff failed to carry its burden of proof.
Despite Plaintiff's failure to carry its burden of proof and its consequent failure to shift that burden to Defendant, this court "has jurisdiction to determine the real market value or correct valuation [of property] on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant presented evidence sufficient to support the 2010-11 real market value determined by the Board of Property Tax Appeals (BOPTA) for the owner-occupied subject property. The court accepts BOPTA's determination. *Page 12 
 III. CONCLUSION
After careful consideration of the testimony and evidence, this court concludes that Plaintiff failed to carry its burden of proof. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.
Dated this ___ day of October 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron October 26, 2011. The Court filed and entered this documenton October 26, 2011.
[1] All references to Oregon Revised Statutes (ORS) are to the 2009 edition.
[2] All references to Oregon Administrative Rules (OAR) are to the 2009 edition. *Page 1