IN THE OREGON TAX COURT
MAGISTRATE DIVISION
PropertyTax

HOLIDAY HILLS TRAILER RESORT, INC. )
)
        Plaintiff, ) TC-MD 130102N
)
  v. )
)
LINCOLN COUNTY ASSESSOR, )
)
        Defendant. ) **DECISION**

Plaintiff appeals the real market value of property identified as Account R392470

(subject property) for the 2012-13 tax year. A trial was held in the Oregon Tax Courtroom in

Salem, Oregon, on July 18, 2013. Joan M. Chambers, Attorney at Law, appeared on behalf of

Plaintiff. Roger D. Anderson (Anderson), MAI, certified general appraiser; Sean Butler (Butler),

secretary, treasurer, and 50 percent shareholder of Plaintiff; and Greg Stuart (Stuart), employee

of Plaintiff, testified on behalf of Plaintiff. Kristin H. Yuille, Assistant County Counsel,

appeared on behalf of Defendant. Peter A. Boris (Boris), Chief Appraiser, testified on behalf of

Defendant. Plaintiff's Exhibits 1 through 32 and Defendant's Exhibits A, B, C, D, D-1, D-4, and

D-5 were received without objection.

## I. STATEMENT OF FACTS

The subject property is used as the Holiday Hills Trailer Resort (Holiday Hills), the only

mobile home park with ocean frontage in Oregon's four northernmost coastal counties. (Def's

Ex A at 28.) It consists of 11.16 acres on Highway 101 in "an unincorporated area known as

Lincoln Beach" between Lincoln City and Depoe Bay. (Def's Ex A at 19; Ptf's Ex 1 at 17-18.)

Butler testified that his family has operated Holiday Hills since his grandfather purchased it in

/ / /

1966.  He testified that, in 1980, his mother "paid off" the property, which, as of the 2012-13 tax year, was owned equally by Butler and his brother, Tom Butler, president of Holiday Hills.

Holiday Hills consists of 79 mobile home spaces: 69 single wide, 9 double wide, and 1 triple wide.  (Ptf's Ex 1 at 20.)  Boris reported that the subject property has "approximately 300 lineal feet of ocean frontage or access."  (Def's Ex A at 4.)  Butler testified that, of the subject property's ocean front land, 167 feet is occupied by ocean front spaces; and the remaining ocean front land is reserved for beach access, a sewer pump house, and vegetation.  Stuart, an employee of Holiday Hills and Butler's half-brother, testified the beach could be seen only from the western-most part of Holiday Hills, which is terraced into three layers held in place by riprap.

Anderson considered the subject property's highest and best use both as vacant and as improved.  (Ptf's Ex 1 at 22.)  Anderson determined the subject property's highest and best use as vacant was "a minor partition with (1) one acre ocean front lot [at] $400,000, (2) one acre ocean view lots at $150,000 and a (34) lot subdivision on the remaining acreage with a retail value of $57,000/lot and an estimated value of $11,400/lot after deductions for development costs and developers profit * * *."  (*Id.* at 23.)  However, Anderson wrote that creating a subdivision on the assessment date would have been unwise "due to lack of demand."  (*Id.* at 22.)  After determining the total value of the subject property land if partitioned and subdivided, $1,087,600, Anderson subtracted demolition costs and expenses required under ORS 90.645[1] for decommissioning a "manufactured dwelling park" for a total value of $683,000 for the subject property as vacant.  (*Id*. at 23; Ptf's Ex 14 at 2-4.)

---

[1] ORS 90.645(1) (2011) states:

"If a manufactured dwelling park, or a portion of the park that includes the space for a manufactured dwelling, is to be closed and the land or leasehold converted to a use other than as a manufactured dwelling park, and the closure is not required by the exercise of eminent domain or by order of federal, state or local agencies, the landlord may terminate a month-to-month or fixed term rental agreement for a manufactured dwelling park space:

To determine the subject property's real market value as improved, Anderson used the sales comparison and income approaches. (Ptf's Ex 1 at 25-33.) He determined a reconciled indicated value of $1,030,000 for the subject property. (*Id.* at 34.) Anderson concluded that the subject property's highest and best use was the existing use as a "mobile home park," which yields "a marginally higher overall value than the underlying land value by itself." (*Id.* at 22.)

In his sales comparison approach, Anderson used five sales from 2007 to 2011. (*Id.* at 26.) Anderson's sales were located in Sutherlin, Creswell, Reedsport, Roseburg, and Tillamook; none were located in or near Lincoln Beach or Depoe Bay. (*Id.*) Anderson testified that none of his sales were ocean-front. Anderson adjusted his comparable sales based on net operating income per unit. (*Id.* at 26-27.) He concluded that the subject property's real market value under the sales comparison approach was $1,027,000. (*Id.*)

In his income approach, Anderson used three years of the subject property's operating statements, from 2009 to 2011. (*Id.* at 28.) He considered comparable rents from Holiday Hills' competitors along the coast, finding "[Holiday Hill]'s rates were market competitive," but he found no comparable rents for triple wide mobile homes. (*Id.* at 30.) Anderson reported that the subject property's actual vacancy rate was 16.7 percent, which "was similar to the recent data." (*Id.*) He concluded vacancy and collection loss of 15 percent. (*Id.*) Anderson testified that Holiday Hills' actual expense ratio of 69.2 percent was "way high," noting that expenses for

"(a) By giving the tenant not less than 365 days' notice in writing before the date designated in the notice for termination; and

"(b) By paying a tenant, for each space for which a rental agreement is terminated, one of the following amounts:

"(A) $5,000 if the manufactured dwelling is a single-wide dwelling;

"(B) $7,000 if the manufactured dwelling is a double-wide dwelling; or

"(C) $9,000 if the manufactured dwelling is a triple-wide or larger dwelling."

competing businesses ranged from 21.5 percent to 43.8 percent. (*Id*. at 26.) In his determination of expenses, Anderson testified that he excluded some legal and accounting expenses because they "may have included some non-park expense[s]." (*Id*. at 30.) He included property taxes based on actual property tax expenses. (*Id*. at 31.) Anderson concluded that the subject property's real market value under the income approach was $1,056,000. (*Id*. at 33.)

Boris "attempt[ed] to create an indirect or inferred valuation [of the subject property] by adjusting historical sales of similar property to determine a range of values appropriate to the subject property." (Def's Ex A at 88.) He also "attempt[ed] to value the subdivision that could be created from this semi-developed subject property and value the theoretical building lots within the subdivision with prices from the local, current market." (*Id.*) Boris did not complete an income approach, explaining that, because "the highest and best use of the subject property is most likely a residential subdivision * * * the income approach would be pointless." (*Id.* at 134.) Similarly, he determined "the cost approach to the improvement is basically not helpful or relevant[]" because "the current use is not the highest and best use." (*Id.* at 135-36.) Boris did not complete a sales comparison approach because "comparable sales to the subject [property] are not available on a timely basis." (*Id.* at 137.)

Boris determined the subject property's vacant land real market value using the sales comparison approach. (Def's Ex A at 88.) He considered four land sales ranging in size from 3.02 to 13 acres that sold between 1995 and 2006. (*Id.* at 88-105.) Boris testified that gathering comparable sales over such a long period was necessary to find properties similar in size, location, and utility access. Based on those sales, Boris "estimate[d] the January 1, 2012[,] value of the subject property in its current minimally developed state to be between $2 and $3 million dollars, $2,500,000." (*Id.* at 105.) He stated that "valuation [was] allowing for developers profit,

the relocation of the displaced manufactured homes, further development and conversion into a high value, densely divided residential or condominium subdivision." (*Id.*)

Using "an atypical cost approach," Boris made a "theoretical" calculation of the subject property's "potential value [as] a residential subdivision." (Id. at 114.) He mathematically divided the subject property's area by 6,000 square feet, the minimum lot size, with a 30 percent allowance for roads. (*Id.* at 114, 133.) Boris determined that 58 lots could be created, with prices varying depending on whether a lot was ocean front, ocean view, or inland "with little to no view." (*Id.*) He calculated the total project sale price based on the likely lot sale prices and deducted 50 percent of that total price for the typical development cost. (*Id.*) Boris based the 50 percent deduction on conversations with "local realtors and developers who advised selling developed land for twice acquisition price to cover profit and development expenses." (*Id.* at 115, 132.) He concluded a value of $2,301,390. (*Id.* at 133.)

Boris did not provide a proposed plat or a physical depiction of his proposed subdivision of the subject property. He testified that he had not visited subject property since 2006 and had never fully inspected the subject property. Boris testified that his approach used "the potential value and worked backwards," adding "this is all theoretical, but given that there are no sales, this is just an approximation, only an approximation." Anderson criticized Boris's analysis because Boris did not conduct any study of the feasibility of decommissioning the subject property and developing a subdivision, and he did not account for the costs of decommissioning the subject property or developing a subdivision.

Boris concluded that the subject property's "estimated highest and best use is for the development of a high end residential subdivision in connection with the oceanfront, ocean view and ocean proximity location of the individual lots[.]" (Def's Ex A at 137.) He testified that the

Bella Beach development north of the subject property is an example of that use. Boris based his highest and best use conclusion on the absence of ocean-front mobile home parks; the lack of ocean-front properties of a similar size to the subject property in Lincoln County; and the use of nearby properties for single-family residential development. (*Id*. at 28, 52, 88.) He concluded the subject property's real market value as of January 1, 2012, was $2,300,000. (*Id.* at 138.)

Butler and Stuart testified that the subject property's topographical features might prevent Boris's proposed development. Butler testified the subject property is terraced into several levels, each held back by concrete retaining walls, of which the northern most was "failing." He testified as to the general location of the sewer main and its easement over which new buildings cannot be constructed. Butler testified that a gully exists on the subject property's northern edge that facilitates drainage and would limit potential new construction. Butler testified that decommissioning Holiday Hills would involve removing abandoned property and water and sewer lines for an estimated cost of $294,650. (Ptf's Ex 31.) Butler testified that ORS 90.645 requires payment to residents if the subject property is decommissioned for an estimated cost of $354,000 and additional costs would be incurred due to loss of revenue over the one year decommissioning period required under ORS 90.645(1)(a). (Ptf's Ex 14 at 2-4.)

Stuart testified that the subject property's soil composition is an unsuitable foundation for houses; it is composed of an 18-inch top layer of "decomposing pine needles," an 18-inch layer of "soft sand," and at least seven feet of sandstone. He testified that the subject property's soil composition has prevented placing water, sewer, and electrical lines deeper than two feet and limited its construction potential. When questioned by Defendant about the basis for his opinion, Stuart testified that he worked with the land and the retaining walls "constantly" and the soil would collapse under the weight of a house, as it had previously under the weight of a fire truck.

The subject property's 2012-13 tax roll real market value was $2,169,100, and its 2012-13 maximum assessed value was $1,653,200.  (Def's Ex C at 28.)

## II.  ISSUES

1. What is the subject property's highest and best use as of January 1, 2012?

2. What was the subject property's real market value as of January 1, 2012?

## III. ANALYSIS

The ultimate issue before the court is the subject property's real market value for the 2012-13 tax year.  "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citation omitted).  Real market value is defined in ORS 308.205(1),[2] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2012-13 tax year was January 1, 2012.  ORS 308.007; ORS 308.210.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence.  ORS 305.427.  A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).  "Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)).  "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

---

[2] All references to the Oregon Revised Statutes (ORS) are to 2011.

"[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003); OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property). Anderson used the income and sales comparison approaches to determine the subject property's real market value. Based on his highest and best use conclusion, Boris used only land sales and "an atypical cost approach," giving no consideration to other approaches.

A.    *Highest and best use*

Appraisal of property begins with determining the highest and best use of the property.[3] *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809, 812 (1990) ("The *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use"). Highest and best use is defined as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately

/ / /

---

[3] *But cf.* Appraisal Institute, *The Appraisal of Real Estate* 295-96 (13th ed 2008):

"In many appraisal assignments, the final tests of financial feasibility and maximum productivity require information that is obtained from the application and development of the approaches. Therefore, even though the discussion of highest and best use traditionally precedes the approaches to value in an appraisal report, the conclusion of highest and best use often can be finalized only after a preliminary analysis of alternative land uses has been performed. The conclusions reported in the highest and best use section of a report should be consistent with conclusions and applications in the other parts of the report."

supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e) (quoting Appraisal Institute, *The Appraisal of Real Estate* (12th ed 2001)). "The test of highest and best use is not a mechanical application of whether a use is physically possible, legally permissible, financially feasible and maximally productive. Rather, those factors must be related in each instance to the market conditions involved." *Fred Meyer, Inc. v. Dept. of Rev.* (*Fred Meyer*), 12 OTR 85, 88-89 (1991).[4] "[T]he [highest and best use] affects what other properties may be considered comparable, a fundamentally important question when selecting so called 'comparable' sales and determining, where appropriate, which properties are selected for use in determination of elements of the income indicator analysis." *Hewlett-Packard Company v. Benton County Assessor*, TC 4979, 2013 WL 1987281 at *2 (May 15, 2013).

Analysis of highest and best use requires consideration of four tests: is a use physically possible; legally permissible; financially feasible; and maximally productive. Anderson concluded the subject property's highest and best use was its existing use as a mobile home park, whereas Boris concluded its highest and best use was development as a residential subdivision. There is no dispute that both uses are physically possible and legally permissible.[5] (Ptf's Ex 1

/ / /

/ / /

---

[4] "For example, market analysis may indicate the need for a large office building in a community. If the subject site is surrounded by modern, single-family residential developments, however, a large, multistory office building would probably not be logical, even if it were legally permitted. Similarly, a housing development for the elderly might be a permissible use for a site, but if most residents of the area are under 40 years old, this use may be illogical and would probably not meet the criterion of financial feasibility." *Fred Meyer*, 12 OTR at 89 (internal quotations omitted) (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 277 (9th ed 1987.))

[5] Plaintiff disagrees that the subject property would support as many residential lots as Boris determined, given the subject property's topography and soil composition. However, there is no dispute that the subject property could support some number of residential lots. Indeed, Anderson determined that the subject property's highest and best as vacant would be a partition and future development as a residential subdivision. (Ptf's Ex 1 at 22.)

at 22; Def's Ex A at 85-86.)  Anderson determined that development of the subject property into residential lots was financially feasible, but not maximally productive.  (Ptf's Ex 1 at 22.)  Boris questioned whether the subject property's existing use is financially feasible.[6]  (Def's Ex A at 87.)

"As long as a potential use has value commensurate with its cost and conforms to the first two tests [physically possible and legally permissible], the use is financially feasible."  Appraisal Institute, *The Appraisal of Real Estate* (*Appraisal of Real Estate*) 284 (13th ed 2008).

> "If the physically possible and legally permissible uses are income-producing, the analysis of financial feasibility will often focus on which potential uses are likely to produce an income (or return) equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization of the investment."

(*Id.*)  The subject property is an income-producing property and there is no evidence that the subject property's existing use is not financially feasible.  Having found that both appraisers' uses pass the first three tests, the court must determine which use is maximally productive.

"The test of maximum productivity is applied to the uses that have passed the first three tests." *Appraisal of Real Estate* at 285.  "If the existing use will remain financially feasible and is more profitable than modification or redevelopment, the existing use will remain the highest and best use of the property as improved." *Id.* at 288.  Anderson considered the subject property's highest and best use both as vacant and as improved and concluded that its highest and best use was its existing use as a mobile home park.  As vacant, Anderson agreed with Boris that the subject property's highest and best use would be single-family residential development, but disagreed as to the number and type of lots that could be developed.  Based on sales within

---

[6] Boris wrote: "The complete lack of another manufactured home park on oceanfront land is telling.  The cost of the land to create a park would most likely not provide sufficient income to justify the investments, otherwise, there would be others."  (Def's Ex A at 87.)

two years of the assessment date, Anderson concluded the subject property's total value if developed as single-family lots would be $1,087,600. From that value he subtracted demolition costs and expenses required under ORS 90.645, for a value of $683,000 as vacant. (Ptf's Ex 1 at 23.) Anderson determined the subject property's real market value as improved was $1,030,000, supporting his conclusion that its highest and best use was its existing use. (*Id*. at 34.)

Boris considered the subject property's real market value as vacant land and as a high end residential subdivision. Based on the lack of ocean-front mobile home parks in Oregon, Boris inferred that Holiday Hills is not maximally productive. Thus, he did not present an opinion of the subject property's real market value at its existing use. Boris determined that the subject property's vacant land value was $2,500,000 based on sales from 1995 through 2007. Although Boris described those sales as "relatively recent," the court is not persuaded. (Def's Ex A at 87.) Anderson testified that the market as of January 1, 2012, was "drastically different" from before 2007. Sales from 1995 through 2007 are not recent as of January 1, 2012, and are not persuasive evidence of the subject property's real market value for the 2012-13 tax year.

Boris determined the subject property's real market value was $2,300,000 as a 58-lot residential subdivision, which he concluded was its highest and best use. In support of that conclusion, he stated that the subject property land is typical of residential development and is zoned for high-density residential development. His review of "historical land sales" indicated "a latent demand" for residential development. (*Id*. at 86.) Boris's conclusions rely on several unsupported assumptions. For instance, he did not present persuasive evidence that the subject property could be subdivided into 58 lots given its physical characteristics.[7] Boris failed to

---

[7] Anderson determined the subject property could be divided into three larger lots and 34 smaller lots. (Ptf's Ex 1 at 23.)

adequately account for the costs of decommissioning and demolishing the subject property's existing improvements. When comparing the existing use to a use requiring demolition of the existing improvements, the cost of demolition and redevelopment must be included.[8] *See Fred Meyer*, 12 OTR at 87-88 (the court must consider the costs of converting property to its highest and best use, such as demolition costs). Based on Plaintiff's evidence, the demolition costs and decommissioning costs required under ORS 90.645 would total $648,650.

The court is persuaded that the subject property's highest and best use as of January 1, 2012, was its existing use as a mobile home park.

B.      *Market value*

Anderson provided the only evidence of the subject property's real market value based on its existing use, which the court finds was its highest and best use.

1.      *Sales comparison approach*

"In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions." OAR 150-308.205-(A)(2)(c). "The court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, WL 21263620 at *3.

Anderson's comparable sales were exclusively mobile home parks sold from mid-2007 to mid-2011. (Ptf's Ex 1 at 24.) Each sale is located in Oregon, but none are ocean-front like the

---

[8] "Demolition can be considered the most extreme form of modification of the existing use of the property as improved. When an alternative use of the site is legally permissible, physically possible, financially feasible, *and more profitable (less the cost of demolition and redevelopment of the site)* than the continuing use of the existing improvements, then the alternative use will be the highest and best use of the property as improved."

*Appraisal of Real Estate* at 288-89 (emphasis added).

subject property. (*Id.*) Two sales are within four miles of the ocean. (*Id.*) Anderson's sales all had paved roads and parking lots, but the subject property did not. (*Id.* at 27.) He determined the price per space for each of his sales, "[t]he standard unit of comparison" for mobile home parks. (*Id.* at 25.) The unadjusted prices per space of Anderson's sales, ranged from $25,000 to $30,412. (*Id.* at 26.) Anderson adjusted the price per space of each sale by the subject property's net operating income and determined an indicated value of $13,000 per space for the subject property, for a total indicated value of $1,027,000 under the sales comparison approach. (*Id.* at 27.)

Anderson's adjustments based on net operating income "negates the checks and balances provide[] by using more than one approach to value. In effect, the results suffer from circular logic." *Appraisal of Real Estate* at 305.[9] That technique has previously been rejected by this court. *See Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD 110621D, 2012 WL 659199 at *7 (Feb 27, 2012) (rejecting a "market data analysis" in which net operating income was used to adjust comparable sales). When Anderson's sales are viewed without the net operating income adjustment, unadjusted prices indicated a real market value between $1,975,000 and $2,402,548. The court gives little weight to the sales comparison approach because Anderson's sales were not sufficiently similar in location and size to the subject property and Anderson did not provide evidence of appropriate adjustments for those differences.

///

///

///

---

[9] The *Appraisal of Real Estate* explains that "[p]rices of comparable properties are not usually adjusted on the basis of differences in net operating income per unit because rents and sale prices tend to move in relative tandem. A value indication developed using [net operating income] per square foot as a unit of comparison is not independent of a value indication developed using direct capitalization * * *." *Id.* at 305.

2.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254 (citation omitted). "[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr*, WL 659199 at *8 (citation omitted).

Anderson used the subject property's actual income from the three years preceding the January 1, 2012, assessment date, as well as market rents. Rental rates, compiled from mobile home parks "just to the south" of the subject property to 32 miles away in Waldport, ranged from $250 to $370 a month. (Ptf's Ex 1 at 29.) Anderson concluded that "the [subject property's] existing rental rates generally represent fair market rates with $305/month a reasonable base rent for single wide spaces and $325/month a reasonable base rent for double wide spaces." (*Id.*) He added a premium for ocean-view and ocean-front lots, $25 and $100 respectively. (*Id.*) Anderson was unable to find comparable triple wide spaces, so he used rent of $500 per month for the one ocean view triple wide, which he "considered to be reasonable." (*Id.* at 30.) He used a vacancy rate of 15 percent and added miscellaneous income of $4,700, for effective gross income of $257,262. The court is persuaded by Anderson's effective gross income conclusion.

The subject property's actual expenses totaled $178,076, for an expense ratio of 69.2 percent, which is significantly higher than expense ratios of Anderson's comparable sales. That discrepancy may be partially explained by Anderson's inclusion of property tax expenses. *See Morse Hays L.L.C. v. Benton County Assessor*, TC-MD 100697C, 2011 WL 2621890 at *5 (July 5, 2011) ("This court has indicated a preference for an income approach that removes property taxes from expenses and uses a capitalization rate that includes an effective tax rate for property taxes"). Even without property taxes, the subject property's expenses are excessive compared to similar properties. Given the subject property's actual expenses, the court finds an expense ratio of 43.8 percent at the high end of the range is supported, for net operating income of $144,581.

"A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen,* 17 OTR at 260. Anderson determined a capitalization rate of 7.5 percent based on actual comparable sales with rates ranging from 6.72 to 8.94 percent. (Ptf's Ex 1 at 31.) The court finds Anderson's capitalization rate of 7.5 percent is supported by the evidence presented, indicating a real market value of $1,927,750 as of January 1, 2012.

Although $1,927,750 is less than the subject property's 2012-13 tax roll real market value of $2,169,100, it is not less than its 2012-13 maximum assessed value of $1,653,200. For the court to order a change to the tax roll, Plaintiff must be aggrieved. ORS 305.275(1)(a). To be aggrieved, the ordered change to the tax roll must result in a property tax reduction. *See Parks Westsac L.L.C. v. Dept. of Rev.*, 15 OTR 50, 52 (1999) ("So long as the property's maximum assessed value is less than its real market value, taxpayer is not aggrieved"). The subject

property's 2012-13 maximum assessed value was $1,653,200, and the court did not receive evidence as to whether a reduction in the real market value to $1,927,750 would result in tax savings to Plaintiff. The court will not order a change unless Plaintiff is aggrieved.

III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the subject property's highest and best use on January 1, 2012, was its existing use as a mobile home park, and that the subject property's 2012-13 real market value was $1,927,750. The court will not order a change to the tax roll unless Plaintiff is aggrieved. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R392470 was $1,927,750 for the 2012-13 tax year. The tax roll will be adjusted only if Plaintiff is aggrieved under ORS 305.275(1)(a).

Dated this ___ day of August 2013.

_____
ALLISON R. BOOMER
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on August 23, 2013. The court filed and entered this Decision on August 23, 2013.*