IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DEAN STOCKWELL
and JENNIFER STOCKWELL,

   Plaintiffs,

  v.

MARION COUNTY ASSESSOR,

  Defendant.

)
)
)
)
)
)
)
)
)
)
)

TC-MD 140125N

**FINAL DECISION**

On October 8, 2014, the court entered its Decision in the above-entitled matter and requested that the parties submit an allocation of the court's real market value conclusion between the two property tax accounts at issue. In response to the court's decision, the parties filed a letter allocating the court's 2013-14 real market value conclusion between the two property tax accounts at issue as follows: $225,000 to Account R74612 and $839,000 to Account R74620. (Def's Ltr at 1, Oct 17, 2014.) This Final Decision has been modified to remove the court's request, but is otherwise unchanged. The court did not receive a request for an award of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 19.

Plaintiffs appeal the real market value of properties identified as Accounts R74612, R74617, and R74620 for the 2013-14 tax year. In its Answer, Defendant moved to dismiss Account R74617, asserting that Plaintiffs were not aggrieved under ORS 305.275 based on their requested real market value of $65,000 for that account. During the case management conference held on May 19, 2014, Plaintiffs' authorized representative agreed that Account R74617 should be dismissed because Plaintiffs are not aggrieved.

/ / /

A trial to consider Plaintiffs' appeal of Accounts R74612 and R74620 (subject property) was held on August 11, 2014, in the Oregon Tax Courtroom in Salem, Oregon. David A. Hilgemann, Attorney at Law, appeared on behalf of Plaintiffs. Plaintiff Dean Stockwell (Stockwell); Jeffrey R. Tross (Tross), land use planner and consultant; and Jonathan B. Banz (Banz), MAI appraiser with Powell Banz Valuation, testified on behalf of Plaintiffs. Scott A. Norris, Assistant County Counsel, appeared on behalf of Defendant. Steven S. Miner (Miner), Commercial Appraiser Supervisor, testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 12[1] and Defendant's Exhibits A through C were received without objection.

## I. STATEMENT OF FACTS

Banz and Miner each testified that they inspected and appraised the subject property. (Ptfs' Ex 12 at 3; Def's Ex A at 2, 5.) Each appraiser wrote in his report that the subject property's total site size was 4.91 acres. (Ptfs' Ex 12 at 3; Def's Ex A at 1.) Banz wrote that the subject property included the following improvements: a 41,587-square-foot structure (the "main building") built in 1976 that includes office and warehouse space; a 3,200-square-foot structure (the "secondary building"); and a 10,368-square-foot "covered storage" building. (Ptfs' Ex 12 at 23-24.) Miner provided a similar description of the subject property, noting the following additional improvements: a "5,000 square foot shed extension enclosed on two sides" attached to the main building and "4,500 square feet of hoop shelters."[2] (Def's Ex A at 1.) Miner testified that the 5,000-square-foot shed extension has wiring and could be enclosed.

/ / /

/ / /

---

[1] Plaintiffs' Revised Exhibit 12 was received without objection.

[2] Miner wrote that the main building was 41,140 square feet. (Def's Ex A at 1.) The appraisers agreed that the main building included a mezzanine office and warehouse, but that the mezzanine was not to code as of January 1, 2013, and contributed no value to the subject property.

A.    *Plaintiffs' purchase of the subject property*

Stockwell testified that he purchased from Karl Koster (Koster), a boat maker, the subject property, Account R74617, and another tax lot not at issue in this appeal, for $575,000 in June 2013. (*See* Ptfs' Ex 2 (purchase and sale agreement); Ex 3 (buyer's settlement statement).) He testified that Koster was not a related party and was represented by a realtor. (*Id.*) Stockwell testified that that the price of $575,000 was determined based on Koster's difficulty renting the subject property as well as access and flooding issues. Banz wrote that, although the

> "transaction was below market due to the lack of market knowledge by the seller, the buyer did consider the subject's deficiencies including deferred maintenance in the roof and slab, location within a flood plain, access via successive easements and the loss of the right for property uses that require high traffic."

(Ptfs' Ex 12 at 65.)

Stockwell testified that the subject property was in "rough shape" at the time of his purchase. He testified that the main building was dirty and covered in fiberglass dust from boat manufacturing. Stockwell testified that, as of the date of trial, he had hauled away 20 truckloads of debris and had about 20 more to go. He testified that, following purchase of the subject property, he had to upgrade the building to include handicap bathrooms, flood lights, and other improvements. Stockwell testified that, as of the date of trial, he had spent about $100,000 on the subject property, but had more work to do to bring the subject property up to a leasable condition. Banz testified that, as of January 1, 2013, the main building's roof leaked and the western portion of the concrete slab was in poor condition and unusable. (*See* Ptfs' Ex 12 at 25.) He testified that both the roof and the slab needed to be replaced. (*See id.* at 25-26.) Stockwell testified that he received a cost estimate of $210,379 to replace the subject property's roof, siding, and exterior cladding. (Ptfs' Ex 8 at 1-2.) He testified that he received a cost estimate of $568,710 to replace the subject property's interior concrete and exterior pavement. (*Id.* at 3.)

B.  *Access*

Stockwell testified that a 30-foot easement allows access to the subject property from Pringle Road, but the subject property's driveway is only 20 feet wide.[3]  (*See* Ptfs' Ex 7 at 2 (describing access easement).)  He testified that he is not aware of any alternative access to the subject property because the properties to the north and south of the subject property are privately owned and the property to the east of the subject property is a river.  (*See also* Ptfs' Ex 12 at 18 (appraisal report describing the surrounding properties).)  Tross similarly testified that the feasibility of accessing the subject property through the properties to the north and south is "questionable at best."  (*See* Ptfs' Ex 7 at 2, 12 (describing allowable access, vicinity map).)

C.  *Zoning*

Banz and Miner agreed that the subject property was zoned Industrial Park (IP), which Miner testified is a broad industrial zone.  (Ptfs' Ex 12 at 20; Def's Ex A at 6.)  Tross and Miner each testified that, as of January 1, 2013, the only use allowed on the subject property was light boat manufacturing due to a 1976 land use decision that limited the subject property's uses. (Ptfs' Ex 7 at 14-15; Def's Ex A at 6.)  Stockwell testified that he hired Tross to help remove that restriction.  Tross testified that he helped prepare a nonconforming use application for the subject property and Account R74617.  (*See* Ptfs' Ex 7 (staff report prepared for February 26, 2014, public hearing).)  Stockwell testified that the City of Salem granted Plaintiffs' request in a decision issued March 13, 2014.  (Ptfs' Ex 11.)  Tross testified that the decision prohibited uses that might generate a higher volume of traffic due to the subject property's narrow access road. (*Id.* at 1-2, 5-6.)  He testified that a delivery van, cube van, or a truck could use the access road,

/ / /

---

[3] In his appraisal report, Miner described the access road as 22 feet wide.  (*See* Def's Ex A at 7.)

but a semi-truck could not due to its larger turn radius. Miner testified that he reached a similar conclusion with respect to access. (*See* Def's Ex A at 7.)

D.    *Floodplain*

Stockwell testified that a topographic survey prepared when he was trying to rezone the subject property confirmed that the main building is about 1.5 feet below the flood plain. (*See* Ptfs' Ex 5.) He testified that the subject property sits in a bowl and is bordered by two rivers. (*See* Ptfs' Ex 12 at 11 (aerial photograph of subject property site).) Stockwell testified that there are water marks three feet high on the subject property main building and its pavement is cracked from flood damage. Tross testified that the City of Salem staff report noted that "[a]n existing floodplain is located on the subject property" and "[d]evelopment within the floodplain requires a floodplain development permit[.]" (Ptfs' Ex 7 at 3.) Miner testified that, according to Plaintiffs' survey map, the subject property buildings are "right at the top" of the 100 year floodplain. (*See* Ptfs' Ex 5.) He testified that lots of properties in Salem are in the 100 year floodplain, especially industrial properties. (*See* Ptfs' Ex 4.)

E.    *Appraisal reports*

1.    *Property appraised*

Banz appraised the subject property along with Account R74617. (Ptfs' Ex 12 at 16.) In his appraisal report, Banz acknowledged that Account R74617 was "autonomous from the main building and site," but concluded it was "required for parking and yard area." (*Id.* at 25.) In his report, Banz wrote that the subject property's "coverage ratio," including Account R74617, was 21.98 percent and the "coverage ratio" for his comparable sales ranged from 23.94 to 46.02 percent. (*Id.*) Based on his inclusion of Account R74617, Banz wrote that he allocated his real

/ / /

market value conclusion among the two subject property parcels and Account R74617. (*Id.* at 72-73.)

Miner testified that he did not consider Account R74617 necessary to the appraisal of the subject property. (*See* Def's Ex C at 3.) In his report, Miner described the subject property as "a manufacturing warehouse complex." (Def's Ex A at 1.) Miner testified that the economic unit is the properties needed to support the property's use and the subject property is one economic unit; Account R74617 is excess land. (*See id.*) He testified that the subject property has a land to building ratio of 4.2 to 1, "which is more than adequate for the great majority of industrial uses." (*See* Def's Ex C at 3.) Miner testified that the extra land from Account R74617 would increase the land to building ratio to 5:1. (*See id.*) He testified that the average ratio is about 3.1:1 in Marion County. (*See id.*) Miner testified that the subject property is within one fenced area, whereas Account R74617 is outside the fenced area and across the creek. (*See id*.)

2. *Highest and best use*

Banz wrote in his appraisal report that "the **existing flex/industrial improvements** are an adequate expression [of] the highest and best use of the improved [subject] property." (Ptfs' Ex 12 at 49 (emphasis in original).) He testified that his highest and best use conclusion incorporates the assumption that deferred maintenance (the roof and slab) would be cured. Miner testified that he concluded the subject property's highest and best use as improved was to improve it "to a 'C' quality industrial flex complex" and lease it. (Def's Ex A at 12.) Miner testified that a class C property is a "functional" property without any condition issues. He testified that the majority of industrial properties in Marion County were class C. Miner testified that, as of January 1, 2013, the subject property was probably a class D property due to its significant condition issues.

3. *Plaintiffs' appraisal report*

Banz testified that he used the income and sales comparison approaches, but not the cost approach due to the subject property's age and the subjective nature of calculating depreciation.

a.      Cost approach

Although he did not use the cost approach to determine the subject property's total value, Banz wrote that he relied on the Marshall Valuation Cost Service to determine the contributory value of the covered storage building. (Ptfs' Ex 12 at 65-66.) He wrote that the replacement cost new, including 10 percent entrepreneurial profit, was $140,951. (*Id.* at 66.) Banz wrote that he subtracted 50 percent depreciation based on an economic life of 20 years and concluded a real market value of $70,000 for the covered storage building. (*Id.*)

b.      Income approach

Banz wrote in his report that he identified four comparable leases of Salem properties ranging in size from 32,440 to 54,000 square feet. (Ptfs' Ex 12 at 52.) Banz testified that lease 1 was superior to the subject property in location, condition, and quality, so he considered it a high indicator of value. He wrote that lease 1 was a listing from January 2014 for $0.38 per square foot per month, which he adjusted downward for time to $0.34 per square foot per month. (*Id.* at 53, 56.) Banz testified that lease 2 was to "placeholder" tenants, noting that it was difficult to attract tenants due to the size of the property. He wrote that lease 2 was $0.26 per square foot per month on a month-to-month basis, which he adjusted downward to $0.17 per square foot per month for "expense structure." (*Id.*) Banz wrote that lease 2 was a low indicator of value. (*Id.*) Banz testified that lease 3 was a pretty good comparable, but superior in condition and quality to the subject property, so he considered it to be a high indicator of value. (*See id.* at 54, 56.) He wrote that lease 3 was $0.41 per square foot per month modified gross,

which he adjusted downward to $0.30 per square foot per month to reflect triple net. (*Id.*) Banz testified that lease 4 is a newer property with very nice office space located a few blocks north of the subject property. (*See id.*) He wrote that lease 4 was $0.56 per square foot per month modified gross, which he adjusted downward to $0.47 per square foot per month to reflect triple net. (*Id.*)

Banz testified that he concluded a lease rate of $0.27 per square foot per month for the subject property's main building and $0.20 per square foot per month for its secondary building, for total potential gross income of $142,422. (*See* Ptfs' Ex 12 at 55, 58.) He testified that he used a vacancy rate of 10 percent based on Sperry Van Ness and CoStar for effective gross income of $128,180. (*See id.* at 45, 58.) Banz wrote in his report that the subject property's "estimated market rents have been based upon a **triple net** expense structure," so he subtracted three percent for management and five percent for reserves for replacement, for net operating income of $117,925. (*Id.* at 58-59 (emphasis in original).) He testified that he considered reserves of five percent to be reasonable in light of the subject property's age. Banz testified that his four comparable sales indicated capitalization rates ranging from 8.52 to 12.00 percent and he selected a rate of 9.75 percent for an indicated value of $1,209,487 under the income approach. (*See id.* at 59-60.)

        c.     Sales comparison approach

Banz testified that he tried to find market data from 2012 and 2013 in Salem. He wrote in his report that he selected four comparable sales that he considered to be "reflective of light industrial facilities with a similar utility." (Ptfs' Ex 12 at 62-64.) Banz testified that his sale 1 was a purchased by a beverage distributor in January 2012 for $51.71 per square foot. (*See id.* at 63.) He testified that sale 1 was superior to the subject property in quality, condition, and

amount of office space, making it a high indicator of value. (*See id.*) Banz testified that his sale 2 was purchased for $25.74 per square foot in March 2012. (*See id.*) He testified that sale 2 was superior in location and condition, but inferior in quality to the subject property, making it a low indicator of value. (*See id.*) Banz wrote that his sale 3 was purchased for $19.11 per square foot. (*Id.* at 64.) He testified that sale 3 was in fair condition and "sets the bottom of the range." (*See id.*) Banz wrote that sale 4 was purchased in April 2012 for an adjusted price of $39.33 per square foot.[4] (*Id.*) He testified that sale 4 was an "REO sale," but had a reasonable market exposure period and was a reasonable transaction according to the buyer's broker. Banz wrote that sale 4 was similar to the subject property in condition, quality, and location, but lacked the subject property's "flood issues." (*Id.*) He testified that he considered sale 4 a high indicator because it had more office build out.

Banz testified that access is a point of comparison in the sales comparison approach, but he found it challenging to quantify the adjustment for access because he found no paired sales. In his appraisal report, Banz described the subject property's access as "poor." (Ptfs' Ex 12 at 18.) He testified that his comparable sales did not have any condition issues with the exception of sale 3, which he adjusted for the condition. Banz testified that he concluded a value of $30 per square foot for the subject property's main building and $22 per square foot for the secondary building due to its inferior utility and condition. (*See id.* at 65.) Banz wrote that he added the value of the main building, $1,247,610, and the value of the secondary building, $70,400, for a total indicated value of $1,318,010 under the sales comparison approach. (*Id.* at 67.)

/ / /

---

[4] Banz testified that the sale 4 roof failed prior to sale, so he adjusted the sale price by $20,000 for repairs. (*See* Ptfs' Ex 12 at 64.)

d.      Reconciliation

Banz wrote that he added $70,000 for the covered storage building to both his income and sales comparison approach conclusions, bringing his total real market value conclusions to $1,280,000 and $1,390,000, respectively. (Ptfs' Ex 12 at 60, 67.) Banz testified that he gave primary weight to the sales comparison approach and secondary weight to the income approach for a reconciled real market value of $1,350,000. (*See id.* at 70.) He testified that he subtracted a cost to cure of $360,000 for the roof and the western part of the concrete slab based on Plaintiffs' cost estimates and on Marshall & Swift, for a real market value of $990,000. (*See id.* at 71.)

Miner testified that Banz's report should have included the 5,000-square-foot open-ended storage area and the hoop shelters. (*See* Def's Ex C at 1.) Banz testified that he did not assign any value to the open-ended storage area because it did not have the same utility as the commodity shelter. He testified that the hoop shelters could be easily removed and were in bad condition.

4.      *Defendant's appraisal*

Minor wrote in his report that "[a]ll three approaches [of value] were considered and thoroughly investigated for this analysis." (Def's Ex A at 14.)

a.      Cost approach

Miner testified that he identified 10 market industrial land sales in Marion County from 2008 through 2012 and concluded a land value of $2.00 per square foot for the subject property based on "*possible* limited usage and access issues if vacant * * * as well as the small areas lost to stream and banks[.]" (Def's Ex A at 15-16 (emphasis in original).) He testified that he used the Marshall & Swift valuation system to determine the cost of all structures and used a "market-related cost approach" to measure depreciation, which he found to be 1.5 percent per year. (*See*

*id.* at 17.)  Miner wrote that the construction cost new of the covered storage building, including 10 percent entrepreneurial profit and overhead, was $176,443.  (*Id.*)  He subtracted depreciation of 17 percent and concluded the value of the covered storage building, including asphalt parking and gravel, was $146,448.  (*Id.*)  Excluding the parking and gravel, Miner's cost approach indicates a value of approximately $96,000 for the covered storage building only.  (*See id.*)  Miner testified that he concluded a total indicated real market value under the cost approach of $1,590,120 for the subject property.  (*See id.*)

b.      Income approach

Miner wrote in his report that the subject property "was being advertised for new tenants as of early 2014" at an asking price of "$.30 triple-net."  (Def's Ex A at 18.)  He testified that, as of June 2014, 48 percent of the subject property was leased at $0.25 per square foot per month, triple net, with "significant concessions for the first four months, but escalators in years [three] and [five]."  (*See id.*)  He testified that the subject property's other three leases are $0.20 per square foot, $0.23 per square foot, and $0.30 per square foot, modified gross with some concessions.  (*See id.*)  Stockwell testified that, as of the date of trial, the subject property was leased, but not yet occupied, by two tenants.

Miner testified that he identified six comparable leases in Salem.  (*See* Def's Ex A at 18-20.)  He testified that lease 1, for $0.25 per square foot triple net, was overall similar to the subject property, possibly superior for storage purposes, but less flexible for adaptation to other uses.  (*See id.* at 18-19.)  Miner testified that lease 2, for $0.28 per square foot triple net, was superior to the subject property, but could be comparable if the subject property were refurbished.  (*See id.*)  He testified that lease 3, for $0.29 per square foot modified gross, "was in similar condition to what would be expected of the subject [property] once it is cleaned up with

only the most urgent repairs made." (*See id.*)  Miner testified that lease 4, for $0.35 triple net, would be a good indicator for the subject property if it were brought up to class C.  (*See id.* at 18, 20.)  He testified that lease 5, for $0.35 triple net, was a high indicator of value for the subject property at its current condition.  (*See id.*)  Miner testified that lease 6, for $0.40 triple net, was a low quality building in "dilapidated condition."  (*See id.*)  He testified that the lease rate was probably reflective of a desirable location rather than the quality or condition of the buildings, thus it was a high indicator.  (*See id.*)

Miner testified that, based on Fall 2011 survey data from Marion County warehouse owners, the average lease rate for warehouses between 40,000 and 60,000 square feet with an effective age of greater than 30 years and up to 30 percent office or retail was $0.28 per square foot triple net.  (*See* Def's Ex A at 20.)  He testified that, based on that survey, vacancy for older industrial buildings between 40,000 and 60,000 square feet was 14 percent.  (*See id.* at 21.)  Miner testified that he concluded expenses of five percent, assuming the subject property was leased triple net.  (*See id.*)  He testified that he concluded a capitalization rate of 9.4 percent based on Marion County sales of properties with an effective age over 30 years.  (*See id.*)

Miner testified that he considered two cost to cure "scenarios."  (*See* Def's Ex A at 21-22.)  He testified that, under scenario 1, the subject property would be brought up to rentable condition.  (*See id.*)  Miner testified that, under scenario 2, the subject property would be improved to class C warehouse condition with less than 30 years effective age.  (*See id.* at 22-23.)  He testified that both scenarios included the $20,000 expense incurred by Plaintiffs to change the conditional use permit and roof repair or replacement.  (*See id.*)  Miner testified that he did not think the subject property's concrete slab was worse than many others in use, so he subtracted the slab replacement cost only under scenario 2.  (*See id.*)  In his appraisal report,

Miner concluded a cost to cure of $200,000 under scenario 1 and a cost to cure of $745,000 under scenario 2. (*Id.*)

Miner testified that he determined a value under the income approach for each scenario. (*See* Def's Ex A at 21-22.) Miner wrote that, under scenario 1, he used a warehouse lease rate of $0.28 per square foot triple net and, under scenario 2, he used a warehouse lease rate of $0.35 per square foot triple net. (*Id.*) Miner testified that he concluded the subject property's open-sided storage area and material shelter would lease for about $0.15 per square foot.[5] (*See id.* at 22.) He testified that scenario 2 produced the higher real market value of $1,452,053, so that was the maximally productive option.[6] (*See id.* at 22-23.) Miner testified that he concluded a real market value of $1,450,000, rounded, under the income approach after subtracting the cost to cure. (*See id.* at 23.) Banz testified that the maximally productive analysis is not typically part of the income approach and, as a result, Miner's income approach is hypothetical.

       c.     Sales comparison approach

Miner testified that he developed the sales comparison approach only with respect to the main building and not with respect to the secondary building because he could not find any sales of properties comparable to the secondary building. (*See* Def's Ex A at 24.) He wrote in his report that "[t]his is relatively unimportant because the R74612 property value lies mainly in the land and any contribution it makes to the utility of the other tax lot." (*Id.*) Miner testified that his comparable sales do not share the subject property's access problem.

Miner testified that sale 1 was a wood products manufacturing facility in Albany that sold for $29.38 per square foot in January 2011. (*See* Def's Ex A at 24-25.) He testified that it was

---

[5] Under scenario 2, Miner concluded that the open-sided storage area would be enclosed and leased for $0.35 per square foot triple net. (*See* Def's Ex A at 22.)

[6] Miner's real market value conclusion under scenario 1 was $1,335,306. (Def's Ex A at 22.)

similar to the subject property in age and construction, but it was larger than the subject property. (*See id.*) Miner testified that sale 2 was a storage warehouse and utility building in Salem that sold for $29.93 per square foot in March 2010. (*See id.* at 25-26.) He testified that sale 3 was a light manufacturing facility in Gervais of about the same effective age and condition as the subject property that sold for $35.62 per square foot in October 2013. (*See id.*) In his report, Miner adjusted sale 3 upward to $39.41 per square foot because sale 3 needed "immediate roof repairs to retain its usability[.]" (*Id.*) Miner testified that sale 4 was a light manufacturing facility in Aurora that sold for $41.84 per square foot in January 2012. (*See id.*) Miner testified that sales 1, 2, and 3 would be good comparables if the subject property were improved to class C condition. (*See id.* at 25-26.) He testified that sale 4 was of superior construction quality and was a high indicator of value. (*See id.*)

Miner testified that he concluded a value of $35.50 per square foot for the main building and also included the 5,000-square-foot open-sided storage area based on his assumption that it would be enclosed if the subject property were improved to class C condition. (*See* Def's Ex A at 26.) He wrote that the indicated real market value of Account R74620 was $1,007,000 under the sales comparison approach, after subtracting the scenario 2 cost to cure of $745,000. (*Id.*)

d.    Reconciliation

Miner testified that the cost approach is not the best approach given the age of the subject property, but it provided another check on real market value. (*See* Def's Ex A at 27-28.) He testified that he gave the most weight to the income approach and considered the sales comparison approach a useful check. (*See id.*) Miner wrote that he concluded a 2013-14 real market value of $1,450,000 for the subject property. (*Id.*)

///

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2013-14 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1),[7] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2013-14 tax year was January 1, 2013. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a).[8]

"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

[8] The citation is to an Oregon Administrative Rule (OAR).

taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.     *Property appraised*

Banz concluded that the relevant unit of property at issue in this case included Account R74617, which was voluntarily dismissed by Plaintiffs. As a result, Banz divided his real market value conclusion among three property tax accounts. Miner concluded that the subject property was one economic unit based on the physical layout of the properties and the land to building ratio. Based on the evidence presented, the court agrees with Miner that the subject property was one economic unit. The subject property's land to building ratio is within the range indicated by the comparable sales and the subject property is situated within a single fenced area.

B.     *Highest and best use*

Appraisal of property begins with determining the highest and best use of the property. *Freedom Fed. Savings and Loan v. Dept. of Rev.* (*Freedom Fed.*), 310 Or 723, 727, 801 P2d 809, 812 (1990). Highest and best use is defined as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e), quoting Appraisal Institute, *The Appraisal of Real Estate* (12th ed 2001)). "[T]he [highest and best use] affects what other properties may be considered comparable, a fundamentally important question when selecting so called 'comparable' sales and determining, where appropriate, which properties are selected for use in determination of elements of the income indicator analysis." *Hewlett-Packard Company v. Benton County Assessor*, TC 4979, 2013 WL 1987281 at *2 (May 15, 2013).

Banz concluded that the subject property's highest and best use was as improved with industrial flex buildings, assuming that deferred maintenance is cured. Miner concluded that the subject property's highest and be use was as an improved, class C industrial flex complex.[9] In support of that conclusion, Miner testified that the majority of industrial properties in Marion County were class C. In concluding that improving the subject property to class C was maximally productive, Miner determined a cost to cure of $745,000 using the cost estimates provided by Plaintiffs for the roof and slab, the actual cost of the nonconforming use approval, and a few additional adjustments. The court finds that Miner's estimated cost to improve the subject property to class C is speculative and may not adequately capture all necessary costs. Miner assumed that the open-ended shed would be enclosed and leased at the same rate as the main building, but it is unclear whether the cost of enclosing the shed was included in his estimate. As a result, the court accepts Banz's highest and best use conclusion.

C.      *Approaches of value*

1.      *Cost approach*

"In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citing *The Appraisal of Real Estate* at 63). The cost approach is "particularly useful in valuing new or nearly new improvements," but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.* The subject property was over 30 years old as of January 1, 2013, requiring a significant depreciation

---

[9] Miner's analysis to reach this conclusion appears to have been based, in part, on the two scenarios analyzed in his income approach. However, "[t]he *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use." *Freedom Fed.*, 310 Or at 727 (emphasis in original).

deduction under the cost approach. Given the age of the subject property, the court gives no weight to the cost approach to determine the overall real market value of the subject property.

Both appraisers used the cost approach to determine the real market value of the covered storage building. Banz determined a depreciated real market value of $70,000 and Miner determined a depreciated real market value of $146,448. The appraisers used a similar unit cost, but differed in their estimates of depreciation. Neither party presented evidence in support of their depreciation calculations. Absent such evidence, the court accepts Miner's calculation and concludes that the covered storage building's value under the cost approach was $96,000.

2.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 253 (2003) (citation omitted). "A basic requirement of the income method is fixing an annual income to capitalize." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 540, 596 P2d 912 (1979). "[T]he flow of income to be determined is that which 'would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]' " *Id.*, 286 Or at 541-42 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" *Allen*, 17 OTR at 253. Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id.* at 254. "To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254.

Although the subject property was not leased as of January 1, 2013, Stockwell purchased the subject property for investment purposes and was able to lease it by mid-2014. As of

mid-2014, 48 percent of the subject property was leased for $0.25 per square foot per month, triple net, with concessions. Additional space in the subject property was leased for $0.20 per square foot, $0.23 per square foot, and $0.30 per square foot, modified gross, with concessions.

In the absence of stabilized income from the subject property, both appraisers relied on lease comparables to determine market rent. The appraisers both determined that market rent for the subject property would be triple net, yet Banz relied on two modified gross leases adjusted downward and one triple net lease listing. Only Banz's lease comparable 2 at $0.26 per square foot per month was triple net.[10] Of Miner's lease comparables, 1 and 2 were reportedly similar to the subject property and were leased triple net for $0.25 and $0.28 per square foot per month, respectively. Miner's lease comparables 4, 5, and 6 reflected rents above what the subject property could command absent significant improvements.

Banz's lease rates of $0.27 per square foot per month for the subject property's main building and $0.20 per square foot per month for its secondary building are supported by the evidence presented. The court finds potential gross income of $142,422, as concluded by Banz. The court accepts Banz's vacancy rate of 10 percent for effective gross income of $128,180. Both appraisers used a three percent expense for management. Banz used five percent reserves for replacement due to the age of the subject property, whereas Miner used two percent. The court finds that reserves of five percent are high given that both appraisers subtracted the cost to cure deferred maintenance. The court finds reserves of three percent are supported and net operating income was $120,489. The court finds Miner's capitalization rate of 9.4 percent is supported by the comparable sales and survey data presented, indicating a real market value of $1,338,767 under the income approach, not including the covered storage building.

---

[10] Banz reported that lease comparable 2 was triple net, yet made a downward adjustment of that lease for "expense structure." (Ptfs' Ex 12 at 56.) The court concludes that adjustment was in error.

3. *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used." OAR 150-308.205-(A)(2)(c).

Banz's comparable sales ranged from $19.11 to $51.71 per square foot, and he concluded a value of $30 per square foot for the subject property's main building and $22 per square foot for the secondary building due to its inferior utility and condition. Under the sales comparison approach, Banz concluded a total real market value of $1,318,010. Miner's sales ranged from $29.38 to $41.84 per square foot. His three sales most comparable to the subject property were sale 1 for $29.38 per square foot, sale 2 for $29.93 per square foot, and sale 3 for $35.62 per square foot.[11] The court finds that the evidence presented supports Banz's conclusions of $30 per square foot for the main building and $22 per square foot for the secondary building, for an indicated real market value of $1,318,010, not including the covered storage building.

4. *Reconciliation, covered storage building, and cost to cure*

The income approach indicated a real market value of $1,338,767 and the sales comparison approach indicated a real market value of $1,318,010. The court gives equal weight to both approaches and concludes a real market value of $1,328,000, rounded. Adding the value of the covered storage building, $96,000, results in a total real market value of $1,424,000.

---

[11] Miner adjusted sale 3 upward to $39.41 per square foot for necessary roof repairs.

Following purchase, Stockwell spent $100,000 to clean up the subject property and $20,000 to submit a nonconforming use application to expand the allowable uses of the subject property. He provided estimates of $210,379 to repair the subject property's roof and of $568,710 to repair its concrete slab. Banz determined that it was not necessary to replace the entire concrete slab, so he determined a cost to cure of $360,000 reflecting only replacement of the roof and the western portion of the concrete slab. The court finds Banz's cost to cure of $360,000 is supported by the evidence presented and concludes that the real market value of the subject property was $1,064,000 as of January 1, 2013. Prior to issuance of the judgment in this case, the parties shall submit an allocation of the court's real market value conclusion between the two property tax accounts at issue, Accounts R74612 and R74620.

### III. CONCLUSION

After careful consideration, the court concludes that the total real market value of the subject property was $1,064,000 as of January 1, 2013. Now, therefore,

IT IS THE DECISION OF THIS COURT that the total real market value of properties identified as Accounts R74612 and R74620 was $1,064,000 for the 2013-14 tax year.

IT IS FURTHER DECIDED that Account R74617 is dismissed.

Dated this ____ day of October 2014.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on October 24, 2014. The court filed and entered this document on October 24, 2014.*